GENERAL ELECTRIC COMPANY,
Plaintiff–Appellant,

v.

AAMCO TRANSMISSIONS, INC.; Central Albany, Inc.; Robert Fowler, (formerly doing business as A & B Avco); A & B Service Center, (successor to A & B Avco); Sylvester Brackett, doing business as Brackett's Sunoco Station; Charles Smith, doing business as Smith's Automotive and Charles H. Smith's Auto Repairing, (formerly doing business as Charlie Smith Texaco); Harry Malone, doing business as Chick's Sunoco, (formerly doing business as Chick's Auto Service and Chick's Gulf); Colonie Import Distributors Ltd.; John H. Ellsworth, doing business as Gulf Service Station; George's Mobil Mart; James Morgan, doing business as Jim's Northway Arco Service Station; Latham Auto Lab, Inc. and Latham Mobile Mart; Lehmann's Garage; Marshall's Garage, Inc.; Allan Kowsky; Park Tire Sales and Service Center; Two World Tires; Ronald J. Gizzi, doing business as Ron's Service Center; Richard B. Tullock, doing business as Tullock's Service Station; Gulf Oil Company; Shell Oil Company and Atlantic Richfield Company, Defendants,

Gulf Oil Company; Shell Oil Company and Atlantic Richfield Company, Defendants–Appellees.

No. 933, Docket 91–7980.

United States Court of Appeals, Second Circuit.

Argued March 3, 1992.

Decided May 13, 1992.

282

Daniel R. Solin, Solin & Breindel, New York City, for plaintiff-appellant.

Michael A. Smith, Chevron, Houston, Tex., for defendant-appellee Gulf Oil Co.

Scott A. Barbour, McNamee, Lochner, Titus & Williams, Albany, N.Y., for defendant-appellee Shell Oil Co.

David K. Floyd, Phillips, Lytle, Hitchcock, Blaine & Huber, Buffalo, N.Y., for defendant-appellee Atlantic Richfield Co.

Before: CARDAMONE and ALTIMARI, Circuit Judges, TELESCA, District Judge.*

PER CURIAM:

## INTRODUCTION

Plaintiff–Appellant, General Electric Company ("General Electric"), appeals from the decision of the United States District Court for the Northern District of New York (Con. G. Cholakis, *Judge*) granting summary judgment in favor of defendants-appellees, Gulf Oil Company ("Gulf"), Shell Oil Company ("Shell") and Atlantic Richfield Oil Company ("ARCO"), and from a subsequent Order, entered September 17, 1991, which directed the entry of partial final judgment in favor of Gulf, Shell and ARCO (collectively, "the oil companies"), pursuant to Fed.R.Civ.P. 54(b).

This action arose out of a previous cost recovery action in which the appellant, General Electric, was a defendant. That action, *State of New York v. Wray, et al.*, No. 83–CZ–1621, was filed in 1983 and amended to include General Electric in 1984. In *Wray*, the State of New York ("the State") alleged that between 1975 and 1980, H. Eugene Wray and Albany Waste Oil (collectively, "Wray") transported various hazardous substances from General Electric's and other defendants' facilities to a storage site on Waite Road ("the Waite Road site"). The State claimed that hazardous wastes stored at the Waite Road site, which was located on freshwater wetlands, had leaked into the surrounding soil, surface water and groundwater. The State sought, through the provisions of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601, *et seq.*, to hold the defendants liable for the response costs that had been and would be incurred in an effort to clean up the Waite Road site.

On June 7, 1990, the State, General Electric and most of the other defendants agreed to settle the *Wray* action by entering into a Consent Judgment. The Consent Judgment provided that General Electric would undertake and fund the clean-up of the Waite Road site in accordance with a Remedial Action Plan, but permitted General Electric to pursue a subsequent contribution action against any potential defendants that did not participate in the Consent Judgment. General Electric alleges that it has spent over 1.6 million dollars in

---

* Honorable Michael A. Telesca, Chief Judge, United States District Court for the Western District of New York, sitting by designation.

performing the remediation that it agreed to undertake in the Consent Judgment.

On June 18, 1990, General Electric exercised its right to seek contribution by filing this action against thirty individual service stations, which it alleges arranged for the disposal or transport of waste oil stored at the Waite Road site. On December 10, 1990, General Electric filed an amended complaint, adding Shell, ARCO and Gulf as defendants. General Electric alleges that the oil companies, who leased service station facilities and sold petroleum products to some of the service station defendants, are liable under CERCLA for response costs incurred by General Electric in the clean-up of the Waite Road site.

General Electric seeks to hold the oil companies liable under CERCLA as entities that arranged for the disposal or treatment of a hazardous substance, namely waste motor oil that was stored by dealers at service stations they leased from the oil companies. *See* 42 U.S.C. § 9607(a)(3). Following extensive discovery, the oil companies moved for summary judgment. In a decision rendered from the bench, the district court stated that

> G.E. maintains the legal standard is that the party sought to be held liable need only be shown to have the opportunity or authority to control the place or manner of disposal, which apparently means if the parties could have arranged for the disposal of waste, that party may be liable as an arranger. This, in the court's judgment, is not the standard. Here, even assuming the oil companies could have directed the dealers to dispose of their wastes in a particular manner, the record is undisputed that the companies did not do so.

(A–37–38).[1] Thus, the district court concluded that the oil companies were not liable as "arrangers" under CERCLA, and granted their motion for summary judgment. This appeal followed.

## BACKGROUND

From 1953 until 1980, H. Eugene Wray owned and operated a waste oil business in the Albany, New York area. In 1977, Wray hired Scott A. Fayville, who was Wray's only employee, and together they picked up waste oil from several major corporations, including General Electric. In addition, they scavenged waste oil from over one hundred local automobile dealerships, garages and service stations. Three of the dealers that allegedly allowed Wray and Fayville to pump and carry away waste oil from their stations' storage tanks were Sylvester Brackett, Harry Malone (doing business as Chick's Service Station) and James Morgan (doing business as Jim's Northway). All three dealers are named as defendants in this action.

Each of these dealers had a relationship with one of the oil company defendants.[2] Although their relationships differed somewhat in detail, they were fundamentally the same in all respects material to this action. Each of the dealers entered into a detailed lease agreement with his respective oil company, which provided for the lease of service station premises and equipment. The leased equipment included, in each case, an underground tank used for storing waste motor oil until it was disposed of. The dealers also agreed, either in lease agreements or supplemental agreements, to maintain the premises in a certain manner, keep specific minimum hours and purchase minimum amounts of their respective oil company's products. Although it appears that in some cases, the dealers were not required to purchase only those products manufactured by their respective oil companies, at least one dealer believed he was required to do so, and all three of the dealers testified that they in fact purchased petroleum products sold at their stations solely from their respective oil companies.

Each lease or supplemental agreement set forth specific lessor-dealer responsibili-

---

1. Citations to (A–__) are references to the Joint Appendix on appeal.

2. The relationships between the dealers and the oil companies were as follows: Sylvester Brackett—Gulf; Harry Malone—Shell; James Monroe—ARCO.

ties for the maintenance and upkeep of the dealer's service station. For example, in its agreement with Mr. Monroe, ARCO required the dealer to perform daily or weekly maintenance and checks on the underground gasoline storage tanks. ARCO also required that the dealer make sure that the underground tank used for storing waste oil "is emptied as required and that the piping to the tank is kept free of waste, etc." Similarly, in a document entitled "Lessee's Maintenance Obligations," Shell required Mr. Malone to "empty [the] waste oil tank." Gulf made no reference to the waste oil tank in its agreement with Mr. Brackett regarding their respective maintenance responsibilities.

In accordance with the terms of their lease and supplemental agreements, the oil companies encouraged their dealers to sell gasoline and motor oil at competitive prices and conducted periodic inspections to ensure that the station premises and equipment were clean and well-maintained. All three lease agreements did, however, contain a clause providing that the dealers remained independent businessmen. The clause in Shell's agreement with Mr. Malone typifies the language found in each of the leases. It provides that

[n]othing in this lease shall be construed as reserving to Shell any right to exercise any control over, or to direct in any respect the conduct or management of, the business or operations of Lessee on the premises, but the entire control and direction of such business and operations shall be and remain in Lessee, subject only to Lessee's performance of the obligations in this Lease.

(A–415; A–179; A–1308).

As part of their service station operations, each of the dealers during at least some of the period covered by this action, performed oil changes and provided repair services for customers. Dirty oil from engine crank cases was removed from the automobiles and stored in underground waste oil storage tanks until it was re-

moved from the premises by waste oil scavengers.[3] The dealers replaced the used oil with virgin motor oil manufactured by their respective oil companies. Some of the dealers purchased this oil directly from the oil companies, while others purchased it from a "jobber" or middleman. While the oil companies encouraged their dealers to purchase and sell as much of their petroleum products as possible, none of the oil companies required their dealers to perform oil changes.

Although the oil companies' representatives periodically inspected the waste oil tanks and other equipment leased to the dealers, none of them made any recommendations to their dealers regarding the proper way to dispose of waste motor oil, and none of them participated in the decision of how, when or where to dispose of waste oil.

## DISCUSSION

■ The primary issue that faces us in this appeal is whether the oil companies arranged for the disposal of hazardous waste pursuant to 42 U.S.C. § 9607(a)(3). In granting the oil companies' motion for summary judgment, the district court determined that it was undisputed that the oil companies had not directed the dealers to dispose of the waste oil in any particular manner, and in fact that "the responsibility for making arrangement for the disposal of the waste was left totally to the dealers." (A–38).

On appeal, General Electric contends that the district court erred in holding that, in order to be liable as arrangers, the oil companies must have been actively involved in the timing, manner or location of disposal. Appellant argues that, in light of CERCLA's broad scope, this court should interpret arranger liability to include those who have the *ability* or *authority* to direct or control the disposal of hazardous wastes, even though they never participated in the actual decision of how or where to dispose of them. Under this much broader standard, appellants urge

3. Waste oil scavengers came to the dealers' stations periodically to remove the waste oil from the storage tanks. None of the dealers ever paid the scavengers for removing the oil, nor did they receive payment for permitting the scavengers to remove it.

that a genuine issue of material fact exists as to whether the oil companies' allegedly pervasive control of the dealers' day-to-day activities gave them the authority to influence the dealers' waste disposal practices.

As this appeal comes to us on the district court's grant of summary judgment in favor of the defendants-appellees, we must engage in a *de novo* review of the record. We will affirm the district court only if we agree that there is no genuine issue as to any material facts, and that the appellant is entitled to judgment as a matter of law. *B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192 (2d Cir.1992).

A. CERCLA's Statutory Scheme:

CERCLA is a broad, remedial statute enacted by Congress in order to enable the Environmental Protection Agency (the "EPA") to respond quickly and effectively to hazardous waste spills that threaten the environment, and to ensure "that those responsible for any damage, environmental harm, or injury from chemical poisons bear the costs of their actions." S.Rep. No. 848, 96th Cong., 2d Sess. 13 (1980), U.S.Code Cong. & Admin.News 1980, 6119, *reprinted in* 1 CERCLA Legislative History at 320. Under CERCLA, the EPA is authorized to undertake remedial efforts to clean up hazardous waste spills and, where an "imminent and substantial endangerment to the public health exists," to take legal action in order to compel potentially liable parties to undertake their own private clean-up efforts. *Murtha*, 958 F.2d at 1196; 42 U.S.C. § 9606(a).

In enacting CERCLA, Congress established four groups of responsible parties, all of whom are liable regardless of intent, and provided a limited number of narrowly constructed defenses to CERCLA liability. 42 U.S.C. § 9607(a) and (b). Through this scheme of liability Congress envisioned a system that would permit the EPA to recoup its costs from a source of funds other than the taxpayers. It was Congress' intent that CERCLA be construed liberally in order to accomplish these goals. *Murtha*, at 1198.

In order to establish a prima facie case of CERCLA liability, a plaintiff must prove that (1) the defendant is a responsible party as defined by section 9607(a)(1)–(4); (2) that the site at issue is a "facility" as defined by section 9601(9); (3) that there has been a release of hazardous substances at the facility or that such a release is threatened; (4) that the plaintiff has incurred response costs in connection with that release; and that (5) the costs incurred and the response actions taken conform to the National Contingency Plan set up under CERCLA. *Id.* at 1198.

Under CERCLA's liability provision, responsible parties include generators of hazardous waste, present or past owners at the time of disposal of facilities where hazardous wastes are disposed of, transporters of hazardous wastes, and those who arrange for the disposal or transport of hazardous waste. 42 U.S.C. § 9607(a); *Murtha*, at 1198; *Florida Power & Light Co. v. Allis Chalmers Corp.*, 893 F.2d 1313, 1317 (11th Cir.1990). The only issue raised on this appeal is whether the defendants-appellees are liable as entities that arranged for the disposal of a hazardous substance.

B. Arranger Liability Under § 9607(a)(3):

Section 9607(a)(3) provides that,

> any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances,

shall be liable for any necessary response costs consistent with the National Contingency Plan. Disposal, as it is used in section 9607, is statutorily defined. *See* 42 U.S.C. § 9601(29); 42 U.S.C. § 6903(3). Likewise, the terms "hazardous substance," "facility," and "treatment" are all expressly defined by Congress. *See* 42 U.S.C. § 9601(9), (14), (29). Congress has not, however, provided a definition for the phrase "otherwise arranged"—the term

which is critical to a determination of the appellees' liability for response costs incurred by the appellant in connection with the Waite Road site. *See Florida Power & Light*, 893 F.2d at 1317.

Appellant, General Electric, urges this court to read the phrase "otherwise arranged" to include those entities that had the ability or authority to control the waste disposal practices of a third party, even though they never took part in the decision of how, when or where to dispose of the hazardous substance. General Electric argues that this interpretation of section 9607(a)(3) is entirely consistent with CERCLA's broad, remedial structure, and would satisfy Congress' goal of ensuring that those responsible for environmental contamination shoulder the cost of its clean-up.

■ The appellant's argument is appealing, but this court cannot conclude that by enacting § 9607(a)(3), Congress intended to hold any entity that merely had the opportunity or ability to control a third party's waste disposal practices liable as an entity that "otherwise arranged for" disposal or transport of hazardous waste. While "persons cannot escape liability by 'contracting away' their responsibility or by alleging that [an] incident was caused by the act or omission of a third party[,]" the mere existence of economic bargaining power which would permit one party to impose certain terms and conditions on another, does not itself *create* an obligation under CERCLA. *See New York v. General Electric Co.*, 592 F.Supp. 291, 297 (N.D.N.Y.1984).

■ Although arranger liability can attach "to parties that do not have active involvement regarding the timing, manner or location of disposal," *CPC International, Inc. v. Aerojet–General Corp.*, 759 F.Supp. 1269, 1279 (W.D.Mich.1991), there must be some nexus between the potentially responsible party and the disposal of the hazardous substance. *See id.* at 1278; *see also Murtha*, at 1199. This nexus is premised upon the potentially liable party's conduct with respect to the disposal or transport of hazardous wastes. 42 U.S.C. § 9607(a). In other words, Congress employed traditional notions of duty and obli-

gation in deciding which entities would be liable under CERCLA as arrangers for the disposal of hazardous substances. Accordingly, this court concludes that it is the *obligation* to exercise control over hazardous waste disposal, and not the mere ability or opportunity to control the disposal of hazardous substances that makes an entity an arranger under CERCLA's liability provision.

Almost all of the courts that have held defendants liable as arrangers have found that the defendant had some actual involvement in the decision to dispose of waste. *E.g., United States v. Bliss*, 667 F.Supp. 1298, 1306 (E.D.Mo.1987) (defendant had "ultimate authority for decisions regarding disposal" and actively participated in the arrangement of transportation for hazardous substances); *United States v. Ward*, 618 F.Supp. 884, 894–95 (E.D.N.C.1985) (corporate officer who was personally involved in decision to dispose of hazardous substance was liable as an arranger even if he did not know where waste would be disposed of).

The few courts that have held an entity responsible as an arranger in the absence of actual involvement have found that nexus between the potentially liable party and the disposal of hazardous substances to be some obligation to arrange for or direct their disposal. *E.g., CPC International*, 759 F.Supp. at 1278 ("[t]he nexus issue is not a test of whether a party created or left hazardous substances or had title to them, but rather whether the party *assumed responsibility* for determining their fate") (emphasis added).

For example, in *United States v. ACETO Agricultural Chemicals Corp.*, the court held that the defendant, who hired another company to formulate a commercial grade pesticide, would be liable as an arranger if it was established that the defendant owned the technical grade pesticide, the work in progress and the final product and, in addition, knew that the generation of hazardous wastes was inherent in the formulation process. 872 F.2d 1373, 1381 (8th Cir.1989); *Jones–Hamilton Co. v. Beazer Materials & Services, Inc.*, 959 F.2d 126,

131–32 (9th Cir.1992); *see also Levin Metals Corp. v. Parr–Richmond Terminal Co.*, 781 F.Supp. 1448, 1452 (N.D.Cal.1991), *as clarified by Levin Metals Corp. v. Parr–Richmond Terminal Co.*, 781 F.Supp. 1452, 1453 (N.D.Cal.1991) (issue of whether there is a sufficient nexus between chemical companies' acts and disposal of hazardous waste turns on whether "generation of hazardous waste was inherent in the process and whether the chemical companies retained ownership of the chemicals and, therefore authority to control the work in process at all times"). Thus, courts have found that ownership of hazardous substance, when combined with actual control over the process that generates the hazardous waste, supports arranger liability.

Here, the undisputed facts demonstrate that the oil companies had no obligation to exercise control over the manner in which their dealers disposed of waste motor oil. Unlike the defendants in *Levin Metals* and *ACETO*, the oil companies did not own the hazardous substance, nor did they control the process by which waste motor oil was generated. In fact, while the oil companies may have encouraged their dealers to sell as much of their petroleum products as they could, the uncontroverted evidence demonstrates that they did not require their dealers to perform oil changes.

It was a matter of practice for each dealer to collect the waste oil and store it in an underground tank until it was disposed of. The fact that the oil companies leased the underground storage tanks to their dealers is not sufficient to make them liable as arrangers under CERCLA. The oil companies did not provide by contract that they would have any responsibility for the disposal of the waste oil collected by each of the dealers. As evidenced by the "independent business" language appearing in all three leases, the decision of whether or not to perform oil changes, and the manner in which the waste oil collected would be disposed of, was left entirely to the dealers.

Similarly, the oil companies' sale of virgin motor oil products to their dealers, either directly or indirectly, does not create an obligation to control the disposal of the waste motor oil. *Florida Power & Light*, 893 F.2d at 1319 (mere sale of a useable product does not create CERCLA arranger liability). Nor does the fact that the oil companies leased service stations to their dealers and required certain minimum hours of operation and imposed minimum standards of cleanliness make them liable as arrangers. To the extent that the oil companies did exercise control over certain aspects of their dealers' businesses, none of it was directed toward either the generation of or the disposal of waste oil. Thus, in the absence of a contractual provision to the contrary, the undisputed facts of this case demonstrate that the oil companies were under no obligation to arrange for the disposal of waste oil collected by their dealers.

The appellant's citation to *United States v. Fleet Factors Corp.* and similar cases in support of their argument that the oil companies' alleged control over the dealers subjects them to arranger liability is unavailing. 901 F.2d 1550 (11th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 752, 112 L.Ed.2d 772 (1991). Although the *Fleet Factors* court contemplated liability where the authority to control operations of a third party exists, it did so in the context of "owner or operator" liability, and not arranger liability. *Id.* at 1554–55. Owners or operators and arrangers are two distinct types of responsible parties with distinct characteristics. *Compare* 42 U.S.C. § 9607(a)(1) and (2) *with* § 9607(a)(3). The factors which make an owner or operator a responsible party do not apply with equal force in determining arranger liability.[4]

Thus, we conclude that the undisputed facts of this case demonstrate that a sufficient nexus does not exist between the

---

4. In fact, absent the actual exercise of management authority, courts have refused to impose liability on an entity that merely "knew about the nature of the facility's operations and had 'the power to get involved in actual management' of the facility." *Levin Metals Corp. v. Parr–Richmond Terminal Corp.*, 781 F.Supp. 1454, 1457 (N.D.Cal.1991); *see also In Re Bergsoe Metals Corp.*, 910 F.2d 668, 671–73 (9th Cir. 1990).

appellees' acts and the dealers' disposal of the waste motor oil to warrant the imposition of arranger liability on the oil companies.

C.   Aider and Abetter Liability:

■   Appellant also contends that even if the appellees are not liable as arrangers, the district court should have imposed liability on them under the common law doctrine of aider and abetter liability. We need not determine whether common law doctrines can be used to supplement CERCLA's detailed statutory scheme because the common law theory of aider and abetter liability simply does not apply to the facts of this case.

Traditionally, an individual may be subject to liability for the tortious conduct of another as an aider and abetter if he

knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so conduct himself.

Restatement (Second) of Torts, § 876(B). There is simply no evidence in this case to suggest that the oil companies knew their distributors' disposal of waste oil constituted a breach of any kind or that they gave assistance or encouragement to the distributors to so dispose of such waste. Instead, the oil companies took no part in the disposal of waste oil and there is no evidence that they had knowledge of the distributor's disposal practices. Thus, plaintiff's claim that the oil companies are liable as aiders and abetters is without merit.

CONCLUSION

Based on the undisputed facts in this case, we find that Shell, ARCO and Gulf did not have the obligation to exercise control over their dealers' waste oil disposal practices and, therefore, were not arrangers within the meaning of CERCLA, 42 U.S.C. § 9607(a)(3). Accordingly, we affirm the district court's grant of summary judgment to the defendants-appellees, Shell, Gulf and ARCO.