**BRIGGS & STRATTON CORPORATION,**
**a Wisconsin corporation, Plaintiff,**

v.

**CONCRETE SALES & SERVICES, INC.,**
**a Georgia corporation; Frances M.**
**Coody and Timothy A. McCord, as**
**Trustees for the Irrevocable Trust of**
**T.A. McCord, Jr.; Turner Ashby McCord,**
**Jr.; Alvin E. DeGraw, Jr.; and Peach**
**County, Georgia, Defendants,**

v.

**David E. ROSE; Peach Metal Industries,**
**Inc.; Ann H. DeGraw as Executrix of**
**the Estate of Alvin E. DeGraw, Sr.; Mi-**
**chael J. Bogna, Bluebird Body Compa-**
**ny; Cardinal Manufacturing Company;**
**Allied Chemical Corporation; South-**
**eastern Bolt & Screw, Inc.; Simplex**
**Nails; Scientific Atlanta; and Thiokol**
**Corporation, Third–Party Defendants**

No. 5:95–CV–525–1 (WDO).

United States District Court,
M.D. Georgia,
Macon Division.

Jan. 21, 1998.

Daniel S. Reinhardt, David C. Vigilante, Atlanta, GA, for Briggs & Stratton Corp.

Linwood Robert Lovett, J. Douglas Cowart, Craig N. Cowart, Robert C. Norman, Jr., Macon, GA, for Concrete Sales and Services, Inc., Frances M. Coody and Timothy A. McCord.

Robert C. Norman, Jr., Macon, GA, for Turner Ashby McCord, Jr.

Alvin E. DeGraw, Jr., Fort Valley, GA, pro se.

Edward H. Lindsey, Jr., Kathryn A. Cater, Atlanta, GA, for South Carolina Ins. Co.

Michael Morgan Smith, Macon, GA, for Peach Metal Industries, Inc.

William Michael Peterson, Warner Robins, GA, for Ann H. DeGraw.

Ann H. DeGraw, Fort Valley, GA, pro se.

Thomas W. Rhodes, Edward H. Wasmuth, Jr., Atlanta, GA, for Blue Bird Body Co. and Cardinal Mfg. Co.

F. Kennedy Hall, Macon, GA, Thomas T. Terp, J. Steven Justice, Cincinnati, OH, for Allied Chemical Corp. and Thiokol Corp.

Carey M. Johnson, Joyce F. Mocek, Shawn M. Willette, Atlanta, GA, for Simplex Nails.

## *ORDER*

OWENS, District Judge.

Third-party defendants Blue Bird Body Company ("Blue Bird") and Cardinal Manufacturing Company ("Cardinal") have filed a motion for summary judgment. Defendants/third-party plaintiffs Frances M. Coody and Timothy A. McCord, Trustees of the irrevocable trust of T.A. McCord ("the Trustees") have filed a brief in response thereto. Third-party plaintiff T.A. McCord, Jr. ("McCord") has filed a separate response in opposition to Bluebird/Cardinal's motion.

The history of the case and the underlying facts have been provided in this court's previous ruling in favor of third-party defendant Simplex Nails. *See Briggs & Stratton Corporation v. Concrete Sales & Services, Inc.,* 971 F.Supp. 566 (M.D.Ga.1997). Plaintiff Briggs & Stratton filed its complaint pursuant to the Comprehensive Environmental Response, Compensation and Liability Act, as amended ("CERCLA"), 42 U.S.C. §§ 9607(a), 9613(f), and 9613(g), seeking contribution and indemnity for response costs Briggs & Stratton incurred pursuant to an EPA administrative order requiring it to remediate environmental contamination. The environmental contamination occurred on a site owned by the third-party plaintiffs in Byron, Georgia. Third-party defendant Peach Metal Industries, Inc. ("PMI"), had leased the site from Turner Ashby McCord, Jr., for purposes of operating its metal plating and finishing business. The operation of PMI's business resulted in the release of hazardous wastes. During the time the metal finishing business was being operated and the hazardous wastes were being released, Bluebird/Cardinal were customers of PMI who utilized PMI's services for electroplating parts which were then used in Blue Bird/Cardinal's own manufacturing business.

CERCLA authorizes suit for contribution and indemnification costs against four classes of individuals: "(1) the owners and operators of a facility at which a release or threatened release of hazardous substances exists; (2) the owners or operators of such a facility any time in the past when hazardous substances were disposed of: (3) any person or entity who "arranged for" the treatment or disposal of a hazardous substance at the facility; and (4) any persons who transported hazardous substances to the facility." *Florida Power & Light Co. v. Allis Chalmers Corp.,* 893 F.2d 1313, 1317 (11th Cir.1990); *United States v. Aceto Agricultural Chemicals Corp.,* 872 F.2d 1373 (8th Cir.1989); see 42 U.S.C. § 9607(a). Section 9607(a)(3) imposes liability as an "arranger" for the disposal of hazardous substances upon:

> any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances.

The Trustees and McCord filed separate third-party complaints against Blue

Bird/Cardinal and other third-party defendants asserting claims under § 9607(a)(3), for which they seek contribution and indemnity pursuant to 42 U.S.C. § 9613(f). The Trustees and McCord allege that by utilizing the electroplating services of PMI, Blue Bird/Cardinal "arranged for" the disposal of hazardous wastes at the PMI site. The Trustees further allege that Blue Bird/Cardinal committed state-law trespass and waste and operated a continuing nuisance at the PMI site. McCord asserts an additional state-law claim against Blue Bird/Cardinal for active negligence.

## I. Facts

Blue Bird Body Company is a manufacturer of school buses, commercial buses, and motor homes in Fort Valley, Georgia. It was owned by the Luce family during the 1960s, 1970s, and 1980s. In 1981 the Luce family formed Cardinal Manufacturing Company, which was owned and controlled by the family and Blue Bird. Cardinal was used to manufacture parts for the buses which were assembled by Blue Bird. Certain metal parts used in the manufacture of the buses needed to be electroplated or galvanized. Rather than performing this process itself, Blue Bird/Cardinal contracted with PMI to perform metal finishing services. By the time PMI ceased operations in 1987, Blue Bird/Cardinal was its biggest customer. Blue Bird/Cardinal was familiar with the metal electroplating process and knew that it necessarily involved the generation of hazardous wastes.

Blue Bird/Cardinal typically sent purchase orders and parts to PMI whenever it needed parts electroplated, specifying the type of plating materials that would be used to finish the parts and the thickness of the coating. The purchase order often referenced blueprints designed by engineers at Blue Bird/Cardinal. The purchase orders and blueprints would specify the type of electroplating or coating—for example, "cadmium plated or zinc plated," "phosphate coating (no oil) with neutralized rinse," or "to be plated with yellow 'D' chromate." Blue Bird/Cardinal would frequently return finished parts to PMI for reworking and to be stripped of scale metal and oils, which involved removing the metal plating that had already been applied.

On the back of the purchase orders Blue Bird/Cardinal sent to PMI there was a list of terms and conditions. Paragraph 23 of the terms and conditions required PMI to comply with the provisions of the Toxic Substance Control Act (Public Law 94-4-69) and regulations and to warrant conformity to and compliance with said Act. The purchase orders also required PMI to comply with all state, federal and local laws, regulations and orders. Two specific purchase orders on forms of Blue Bird and Blue Bird Wanderlodge reflect ownership, in the third-party plaintiffs' view, of the chemicals used in the electroplating process. The first purchase order, on Blue Bird form F-D51753 dated June 27, 1985, is addressed to Peach Metal Industries, Inc. It directs that Shipper No. 11597 ship to Blue Bird Body Company one lot of "zinc and yellow dichromate .0003" and to "expedite charges." A handwritten notation on the form reads "confirming to Al DeGraw, Jr." The second purchase order, dated September 16, 1976, on Blue Bird Wanderlodge Form 9017, directs that 165 lbs. of sulfuric acid be "rush" shipped to Peach Metals in Byron, Georgia.

During the period of the business relationship between the parties, a number of Blue Bird/Cardinal representatives on occasion went to PMI's business to inspect the premises. The representatives from Blue Bird/Cardinal were able to observe the vats and tanks in which PMI's electroplating operations were being conducted. Robert Luce, an owner or general manager at Blue Bird/Cardinal, stated in his deposition that on viewing PMI's operations he felt that PMI appeared to be getting the electroplating done "on a shoestring." He also observed that many of PMI's buildings were in severe disrepair and that the roofs were caving in.

Throughout the period PMI was in operation it became strapped for cash. After be-

ing rejected in its attempt to obtain a bank loan, PMI's officer and shareholder Alvin E. DeGraw, Jr., approached Blue Bird/Cardinal requesting a loan in order to remain in business. In 1983 and then again in 1987, Blue Bird/Cardinal made unsecured loans to PMI which PMI used to purchase supplies. In August of 1983 Blue Bird/Cardinal were inspected by the Georgia Environmental Protection Division ("EPD"), which found violations of the Georgia Hazardous Waste Management Act. The first loan to PMI was made three months later in November of 1983. In December of 1983 Blue Bird/Cardinal asked EPD to reinspect their facility for hazardous waste compliance. Upon reinspection EPD issued Blue Bird/Cardinal a Consent Administrative Order requiring them to pay a fine of $25,-000.00 and to ease the disposal of all hazardous waste at the facility. On February 12, 1987, Blue Bird/ Cardinal made its second loan to PMI for $5,000.00. It was shortly after the second loan, in the spring of 1987, when the EPD determined that PMI was improperly generating and storing hazardous waste on its site and issued a Notice of Violation and Consent Order to PMI.

## II. Discussion

The third-party plaintiffs have not contended that Blue Bird/Cardinal entered into specific contracts or agreements involving the disposal, treatment, or transportation of hazardous substances. They argue instead that by utilizing the electroplating services of PMI, Blue Bird/Cardinal "otherwise arranged" for the disposal or treatment of the hazardous substances. Blue Bird/Cardinal were sophisticated manufacturing companies which together were PMI's largest customer. Engaged in the manufacturing business themselves, Blue Bird/Cardinal knew the intricate details of the electroplating/galvanizing process and knew that the process inherently involved the generation of hazardous wastes. The third-party plaintiffs contend that the degree of knowledge and sophistication possessed by Blue Bird/Cardinal about

the electroplating process itself, as well as the authority they allegedly possessed to control the business operations of PMI, made them arrangers as contemplated by § 9607(a)(3).

Neither the statute nor its legislative history define or provide a great deal of guidance as to meaning of the phrase "arranged for." *South Florida Water Management District v. Montalvo,* 84 F.3d 402, 406 (11th Cir.1996); *Allis Chalmers,* 893 F.2d at 1317. The *Montalvo* court provided the following summary of the various factors courts have used in defining the contours of arranger liability:

> When analyzing whether a particular transaction amounted to an arrangement to dispose, courts have focused on various factors. For example, where the transaction involved a sale, courts have asked whether there was a transfer of a "useful" or "waste" product. *See AM Int'l, Inc. v. International Forging Equip. Corp.,* 982 F.2d 989, 999 (6th Cir.1993); *Prudential Ins. Co. v. United States Gypsum,* 711 F.Supp. 1244, 1254 (D.N.J.1989). In several cases, courts have considered whether the defendant intended to dispose of a substance at the time of a transaction. *See Amcast Indus. Corp. v. Detrex Corp.,* 2 F.3d 746, 751 (7th Cir.1993), *cert. denied,* [510 U.S. 1044], 114 S.Ct. 691, 126 L.Ed.2d 658 (1994); *United States v. Cello–Foil Prods., Inc.,* 848 F.Supp. 1352, 1357 (W.D.Mich.1994); *Edward Hines Lumber Co. v. Vulcan Materials Co.,* 685 F.Supp. 651, 654–56 (N.D.Ill.), *aff'd,* 861 F.2d 155 (7th Cir.1988). Courts have also looked to whether a defendant made the "crucial decision" to place hazardous substances in the hands of a particular facility. *See United States v. A & F Materials Co.,* 582 F.Supp. 842, 845 (S.D.Ill.1984).

■ The court declined to assign bright-line status to the usefulness-waste distinction, the knowledge or intent of the defendant, or the "crucial decision" determination, noting that while these factors are relevant or useful they do not in every case determine liability. *Montalvo,* 84 F.3d at 407. CERC-

LA's remedial scheme must be liberally construed in accordance with the intentions of Congress, but its reach is not boundless. *Id.* at 409. Whether arranger status is found must depend upon the particular facts of each case, using the guidelines of the relevant caselaw along with other pertinent factors in each individual instance. *Id.*

■ Generally speaking, to be found liable as an arranger a party must have either been in actual or constructive ownership or possession of the hazardous wastes. Alternatively, the party must be found to have had the authority or duty to exercise control of the hazardous substance. This authority must be exercised by some affirmative act, which may in an appropriate case consist of a failure to act. *Redwing Carriers, Inc. v. Saraland Apartments,* 94 F.3d 1489, 1506 (11th Cir.1996). Stated another way, the element of control which is one of the prerequisites for arranger liability requires a sufficient nexus between the disposal and the potentially responsible party which may be demonstrated "by showing actual involvement in the decision to dispose or by showing an obligation to control the hazardous substance." *United States v. Fleet Factors Corporation,* 821 F.Supp. 707, 724 (S.D.Ga.1993). "Almost all courts that have held defendants liable as arrangers have found that the defendant had some actual involvement in the decision to dispose of waste." *General Electric Co. v. AAMCO Transmissions, Inc.,* 962 F.2d 281, 286 (2d Cir.1992).

In the previous decision granting summary judgment for third-party defendant Simplex Nails this Court referenced two Eighth Circuit cases which offer significant guidance in attempting to define the contours of arranger liability. In *United States v. Northeastern Pharmaceutical & Chemical Co. ("NEPACCO"),* 810 F.2d 726 (8th Cir.1986), the court was confronted with facts involving a plant supervisor who neither owned nor had actual physical possession of the hazardous substances. Nevertheless, the court found the supervisor subject to liability as an arranger because of his knowledge, immediate supervision, and direct responsibility for the transportation and disposal of the plant's hazardous substances, concluding that "[i]t is the authority to control the handling and disposal of hazardous substances that is critical under the statutory scheme." *Id.* at 743. The defendants in *United States v. Aceto Agricultural Chemicals Corp.,* 872 F.2d 1373 (8th Cir.1989), tested *NEPACCO's* holding by claiming that they could not be arrangers under the statute because they had no authority to control the operations of the party which had actually disposed of their pesticides. *Aceto,* 872 F.2d at 1381. The court found, however, that defendants had actual ownership of technical grade pesticides which they sent to another company to mix and convert into commercial grade pesticides. Their ownership of the hazardous substances and of the work being performed made them liable as arrangers, the court noting that defendants were not free to contract away their obligation to control the hazardous substances by structuring the arrangements for disposal as a sale. *Aceto,* 872 F.2d at 1381–82.

In *United States v. Fleet Factors Corporation,* 821 F.Supp. 707 (S.D.Ga.1993), Fleet Factors employed two companies, Baldwin and Nix, to conduct an auction and salvage of equipment and machinery in which Fleet Factors had a security interest. After a non-jury trial the district court found that Fleet Factor's arrangements with these companies involved an arrangement for the disposal of hazardous wastes located on the premises. Fleet was aware the site contained large quantities of hazardous substances, was generally familiar with the site, and knew that preparations for the auction would include some clean-up of the site to make it safe for public access. *Id.* at 725. The court also found that Fleet was aware that because the plant was deteriorating with holes in the building's roof, it should also have known that even the movement of the hazardous substances to more remote portions of the site would amount to disposal rather than mere storage. *Id.* Thus, the arrangements for auction and salvage under the particular

facts of that case demonstrated a sufficient nexus between Fleet and the disposal of the hazardous wastes to make it an arranger pursuant to § 9607(a)(3).[1]

In *Montalvo*, 84 F.3d 402, the court found that landowners who had contracted with Montalvo and other sprayers to spray their property with pesticide could not be arrangers because they had not taken an affirmative act to dispose of the wastes inherent in such spraying. *Id.* at 407. The court found that the landowners had not assisted the sprayers in loading the planes or rinsing out the applicating tanks, presumably did not even know about the spills at the land site, and had neither the duty or authority to monitor or control the sprayers' activities. The court refused to infer knowledge by the landowners that spraying their lands with pesticides entailed spillage of pesticides and draining of contaminated rinse water. *Id.* at 408–09.

Blue Bird/Cardinal urge that the granting of summary judgment for Simplex Nails mandates entry of summary judgment in their favor. The facts relating to Simplex Nails, another customer of PMI's, showed that PMI transported nails from Simplex to and from the PMI site although Simplex Nails employees had occasionally visited the site. PMI borrowed $3,600 from Simplex Nails on one occasion to allow it to remain in business, this amount being paid back in electroplating work. Simplex Nails was aware that the process of electroplating necessarily involved the production of hazardous wastes. However, Simplex Nails did not tell PMI how to perform the electroplating process and made no direct inquiry as to its disposal practices. This court found that generalized knowledge of the electroplating process was an insufficient basis in itself for liability. Simplex Nails did not own the substances used by PMI in the electroplating/galvanizing process. Like Blue

Bird/Cardinal, Simplex Nails returned certain examples of PMI's finished product for reprocessing. However, its possession or ownership of these noncomplying nails prior to the time they were returned for reprocessing was found to constitute an insufficient nexus with the ultimate disposal of hazardous wastes. It was concluded that the third-party plaintiffs had not demonstrated sufficient indicia of Simplex Nails' ownership or possession of the hazardous wastes and had not shown that any of the acts taken in furtherance of the business relationship between Simplex Nails and PMI demonstrated sufficient control over PMI's disposal of the wastes. This court also found that the particular facts relating to Simplex Nails revealed no underlying duty on its part to act to prevent PMI's generation of hazardous wastes.

 The Trustees and McCord advance numerous arguments in favor of their claims that Blue Bird/Cardinal should be found liable as an arranger for the disposal of hazardous wastes generated in PMI's business. As was the case with Simplex Nails, Blue Bird/Cardinal's knowledge that the electroplating for which they contracted with PMI would result in the generation of hazardous wastes does not in itself make them arrangers for disposal of such waste under CERCLA. Such general knowledge does not equate to actual knowledge of PMI's methods of disposing of the wastes, nor does it show actual involvement in the waste disposal. *AAMCO*, 962 F.2d at 286. Nor did Blue Bird/Cardinal's specific knowledge as to the actual electroplating practices of PMI necessarily indicate a concomitant knowledge of its waste disposal practices. Admittedly, officers and employees of Blue Bird/Cardinal inspected PMI's facility on a number of occasions and observed the electroplating process. Greg Whitney, a Blue Bird employee, recalled seeing the spinning basket and the

---

**1.** Because Fleet also qualified as an "owner" of the property under § 9607(a)(2) by virtue of its deed to secure debt, however, it was found not to be liable as an arranger under § 9607(a)(3). *Fleet Factors*, 821 F.Supp. at 725–26. The court held that "application of the § 9601(20)(A) definition of 'owner' to § 9607(a)(2) and § 9607(a)(3) precludes finding Fleet liable under both." *Id.* at 725.

various vats or barrels that the baskets were dipped in. Robert Luce testified that it appeared to him that PMI was "operating on a shoestring." He testified that on a tour of the facility in the mid–1980s: "I saw vats where they dumped the rivets and dumped the parts, picked up the parts, put in another vat of some sort. I remember some sort of spin cycle where they, I guess, dried the parts." The spin cycle involved singling the liquid matter off the galvanized parts. Luce testified that he did not see how the liquid or the effluent from those processes were disposed or where it drained to in that particular building. He further stated that he did not remember drums or any smaller containers in or about the facility. He did, however, see buildings which were not kept up or seemed to be run down or in disrepair, some with the roofs caving in.

◼ In the order granting summary judgment to Simplex Nails, this court found that although employees of that company had general knowledge about the wastes produced by electroplating, they had made no direct inquiry about PMI's disposal practices and there was no evidence that Simplex Nails knew that hazardous wastes inherent in the process were improperly disposed of. While the facts presently before us evince greater knowledge by Blue Bird/Cardinal employees than by Simplex employees as to the run-down condition of PMI's operations, Blue Bird/Cardinal's knowledge of the electroplating operations remains insufficient to impose arranger liability. The evidence does not show that Blue Bird/Cardinal knew that PMI was not properly disposing of its wastes. Knowledge that there were shortcomings in PMI's operations or that some of the buildings were not being kept up is not sufficient to impose a duty upon Blue Bird/Cardinal to exercise control over the waste disposal and indicates neither control nor the authority to control such operations. Contrary to the finding in *Fleet Factors,* Blue Bird/Cardinal's providing parts for PMI to electroplate was not tantamount to ordering PMI to dispose of hazardous wastes, nor did Blue Bird/Cardinal's knowledge that

there were run-down buildings on the premises necessarily imply knowledge that wastes would be improperly disposed of.

◼ Blue Bird/Cardinal's specification of the coating required on the various parts similarly did not constitute an affirmative act constituting control of the disposal of wastes generated in applying the coatings. *See Montalvo,* 84 F.3d at 407. The specifications related to the type of coating and the final result required for each part to be coated but did not go so far as to specify the chemicals or method PMI should use to achieve the end result or to indicate how resulting chemical wastes would be disposed of. The mere furnishing of blueprints or specifying the requirements for the finished product does not constitute control over the actual process required to reach the desired results. The fact that Blue Bird/Cardinal returned some of PMI's finished product for reprocessing also shows, as it did in the case of Simplex Nails, an insufficient nexus with the ultimate disposal of hazardous wastes upon which to predicate arranger liability. The facts of *U.S. v. Gordon Stafford, Inc.,* 952 F.Supp. 337 (N.D.W.Va.1997), to the extent that they would suggest otherwise, are inapposite to the facts of the present case.

The next argument offered in favor of arranger liability is that the two loans Blue Bird/Cardinal made to PMI showed Blue Bird/Cardinal's control over the electroplating process. The third-party plaintiffs contend that the loans allowed PMI to remain in business and continue polluting while Blue Bird/Cardinal subsidized PMI's electroplating and polluting, thereby escaping the liability they would incur by doing their own electroplating. They contend that it is not coincidental that the first loan for $3,000 to PMI in 1983 was made during the same period of time that EPD was closing Blue Bird's landfill into which it had disposed of hazardous waste since 1971. Other than showing that Blue Bird had its own problems with waste disposal, however, no relationship has been demonstrated between the fine assessed by the EPD regarding Blue Bird's

landfill and Blue Bird/Cardinal's contracting for electroplating services from PMI. There is no indication that Blue Bird/Cardinal ever performed any electroplating themselves or that they ceased their own operations and began using PMI's services to escape further liability for improper disposal.

■ The second loan for $5,000 made in 1987 was around the period of time when EPD began inspecting PMI for violations. Although the loan proceeds were admittedly used to purchase chemicals for use in PMI's electroplating business, the loan was not used specifically to buy chemicals or materials for the exclusive benefit of Blue Bird/Cardinal. Despite the timing, there is no showing that the loans altered the relationship between Blue Bird/Cardinal and PMI or that Blue Bird/Cardinal thereafter assumed control over PMI's operations. Blue Bird/Cardinal states that it made the decision to lend the money so that PMI could remain in business and Blue Bird/Cardinal would realize the benefit of having an available and convenient electroplating operation nearby. Helping to insure that PMI remained in business is not tantamount to assuming the duty or responsibility for control of wastes generated in the continuation of its business. The third-party plaintiffs have failed to demonstrate convincingly that the loans were never repaid or that they were never accounted for on financial statements. As was the case with Simplex Nails, there is insufficient evidence that Blue Bird/Cardinal's loans to PMI were anything other than arm's length financial transactions.

■ The third-party plaintiffs urge that Blue Bird/Cardinal's requirement that PMI comply with the provisions of the Toxic Substance Control Act ("TSCA") and regulations and other state, federal and local laws tended to show control over the process creating the hazardous wastes. The TSCA, 15 U.S.C.A. §§ 2601–2671 (1998) was enacted to "regulate chemical substances and mixtures which present an unreasonable risk of injury to health or the environment, and to take action with respect to chemical substances and mixtures which are imminent hazards." 15 U.S.C.A. § 2601(b)(2). Unlike CERCLA, the TSCA does not provide for a private right of action for a private party against other responsible parties. *See Reading Company v. City of Philadelphia,* 823 F.Supp. 1218 (E.D.Pa.1993). Requiring PMI to comply with the TSCA and other laws did not give Blue Bird/Cardinal the right or duty to control its waste disposal practices.

The third-party plaintiffs contend that the two purchase orders on Blue Bird Body Company's forms evidence ownership of chemicals used in the electroplating process. The forms appear to reflect Blue Bird Body Company's purchase of one lot of zinc and yellow dichromate .0003 on June 27, 1985 and Blue Bird Wanderlodge's purchase of 165 lbs. of sulfuric acid on September 16, 1976, for "rush" shipment to PMI. Blue Bird/Cardinal claims that the purchase orders reflect nothing more than that Blue Bird/Cardinal purchased chemicals from PMI. The third-party plaintiffs assert that the purchase orders show that on at least these occasions Blue Bird/Cardinal purchased and sent hazardous substances to PMI for use in the electroplating process.

The actual significance of the purchase orders is obscure; however, in the court's view they do not adequately demonstrate that Blue Bird/Cardinal had ownership of the chemicals or the work in progress sufficient to impose arranger liability. At most, the purchase orders indicate that Blue Bird/Cardinal purchased chemicals for PMI's use in an isolated instance. It is by no means clear that they were used to process parts provided by Blue Bird/Cardinal or that Blue Bird/Cardinal maintained control over these specific chemicals during the electroplating process. Moreover, there is no indication that such purchases occurred on more than the two isolated occasions, since there is no other evidence that it was the practice of Blue Bird/Cardinal to provide the chemicals for electroplating their parts or that they retained ownership of any such chemicals during the work in progress.

For the reasons discussed hereinabove, the court finds that Blue Bird/Cardinal do not

satisfy the requirements of 42 U.S.C. § 9607(a)(3) and were not therefore arrangers for the treatment or disposal of hazardous substances. Therefore, Blue Bird/Cardinal are not liable for contribution under CERCLA.

■ As for the state law claims, these claims must fail for the reasons set forth in the decision granting summary judgment in favor of Simplex Nails. Additionally, Cardinal and Blue Bird claim that the applicable Georgia statute of limitations bars the state claims. Claims for trespass and property damage claims in Georgia are subject to a four-year statute of limitations. O.C.G.A. § 9–3–30 (1982). Under Georgia law there is no discovery rule in claims involving property damages. Tort claims for damage to property accrue on the date the wrong is committed. *Tucker v. Southern Wood Piedmont Company*, 28 F.3d 1089, 1090 (11th Cir.1994). However, CERCLA provides a federally mandated discovery rule for environmental torts brought under state law. 42 U.S.C. § 9658(a)(1). This is defined as: "[T]he date the plaintiff knew (or reasonably should have known) that the personal injury or property damages referred to in subsection (a)(1) were caused or contributed to by the hazardous substance or pollutant or contaminant concerned." § 9658(b)(4)(A); *Tucker*, 28 F.3d at 1090.

■ The EPA notified the Trustees and McCord of the problems at the PMI site before December 31, 1991. Cardinal and Blue Bird's transaction of business with PMI had ended before December 31, 1987. At the latest, the third-party plaintiffs knew or should have known of the property damage due to the release of hazardous substances when they were notified by the EPA in 1991. Their claims against Blue Bird/Cardinal were not asserted until February of 1996, more than four years later. Thus, their state law claims are barred.

### III. Conclusion

Summary judgment may be granted only if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. *56(c); Warrior Tombigbee Transportation Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir.1983). The evidence and all factual inferences made therefrom must be viewed by the court in the light most favorable to the party opposing the motion. The party seeking summary judgment bears the initial burden of identifying portions of the pleadings, depositions, answers to interrogatories, and admissions which he believes demonstrate an absence of any genuine issue of material fact. *Hairston v. The Gainesville Sun Publishing Co.*, 9 F.3d 913 (11th Cir.1993). In determining whether the moving party has met this burden, the court must review the evidence and all factual inferences drawn therefrom in the light most favorable to the non-moving party. *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir.1992). If the movant successfully meets his burden, the burden then shifts to the non-movant to establish by going beyond the pleadings that there are genuine issues of material fact to be resolved by a fact-finder. *Clark v. Coats & Clark*, 929 F.2d 604, 608 (11th Cir.1991); *Van T. Junkins & Assoc. v. U.S. Industries*, 736 F.2d 656, 658 (11th Cir.1984).

For the reasons stated in this opinion, the court finds that the third-party plaintiffs have not met their burden of establishing that there are genuine issues of material fact to be resolved. Therefore, the motion of Blue Bird/Cardinal for summary judgment on the third-party complaints of Frances M. Coody and Timothy A. McCord, as Trustees for the Irrevocable Trust of T.A. McCord, Jr., and Turner Ashby McCord, Jr., is hereby **GRANTED**.