**James and Margaret DELANEY et al., Plaintiffs,**

v.

**TOWN OF CARMEL, Putnam County, Lynlil Land Development Corp., Howard Stockfield, Thomas Boniello, Michael Barile, Mahopac Sanitation Septic, Inc., Joseph Mantovi, Patsy Deluca, Anthony Deluca, Thomasina Falzerano, Gloria Abrams, Theresa Miller, Marie Schmidt, Jean and Willie McCranie, and James B. and Rosemary Flanigan, Defendants.**

No. 96 Civ. 2850(CM).

United States District Court, S.D. New York.

June 29, 1999.

Court's view, however, the appropriate relief is a stay of further proceedings during pendency of the appeal.

Nicholas Michael Ward–Willis, Keane & Beane, P.C., White Plains, NY, for Margaret Delaney, plaintiffs.

## AMENDED DECISION AND ORDER ON ALL OUTSTANDING MOTIONS FOR SUMMARY JUDGMENT[1]

McMAHON, District Judge.

Plaintiffs, thirty-two homeowners and residents of the Town of Carmel in Putnam County, New York, bring this action seeking relief under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9601 *et seq.* (1995) ("CERCLA"), the Resource Conservation and Recovery Act of 1976, 42 U.S.C. §§ 6901 *et seq.* (1995) ("RCRA"), and the common law against various municipalities, corporations and in-

---

1. This amended opinion replaces the opinion issued in this case on June 4, 1999. This amendment corrects an erroneous description of the plaintiffs found in the Statement of Facts, § II.D of the original opinion. The ultimate outcome remains unchanged.

dividuals whose activities over the last forty-five years have touched on or concerned the land on which their homes stand. After expedited discovery and dismissal or discontinuance of the action against six individual defendants,[2] all ten remaining defendants and all three third-party defendants have moved for summary judgment or dismissal of various claims, counterclaims, cross claims, and third-party claims asserted against them. The motions are disposed of as follows:

I. *Disposition of the Various Motions for Summary Judgment*

A. *Plaintiffs' Claims*

1. **First Cause of Action:** Plaintiffs' RCRA action for hazardous or solid waste clean-up is dismissed with prejudice as against the following defendants: Town of Carmel, Putnam County, Lynlil Land Development Corp., Howard Stockfield, Thomas Boniello, Michael Barile, Joseph Mantovi, and Mahopac Septic Sanitation, Inc.

2. **Second Cause of Action:** Plaintiffs' CERCLA action for hazardous substance clean-up is dismissed with prejudice as against the following defendants: Town of Carmel, Putnam County, Lynlil Land Development Corp., Howard Stockfield, Thomas Boniello, Michael Barile, Joseph Mantovi, and Mahopac Septic Sanitation, Inc.

3. **Third, Fourth, Fifth, and Sixth Causes of Action:** The Court declines to exercise pendent jurisdic-

tion over Plaintiffs' state common law claims of trespass, public nuisance, private nuisance, and negligence against the above-named defendants, and they are dismissed without prejudice to refiling them in the New York State Supreme Court and without prejudice to the assertion of any and all defenses that have been or may be asserted.

4. **Ninth[3] and Tenth Causes of Action:** Plaintiff Koji Higashionna's common law claims for fraudulent conveyance and breach of contract are dismissed without prejudice as against defendants Lynlil Land Development Corp., Howard Stockfield, Thomas Boniello, and Michael Barile.

B. *Defendants' Cross Claims*

The various cross claims for indemnity, contribution, and/or response costs under CERCLA and/or RCRA asserted by the following defendants:

1. Town of Carmel ("Carmel" or the "Town")

2. Putnam County ("Putnam" or the "County")

3. Lynlil Land Development Corp. ("Lynlil")

4. Howard Stockfield ("Stockfield")

5. Thomas Boniello ("Boniello")

6. Michael Barile ("Barile")[4]

7. Joseph Mantovi ("Mantovi")

8. Mahopac Septic Sanitation, Inc. ("MSSI")

---

**2.** Plaintiffs Robert F. and Wendy L. Ruocco dismissed their claims against defendants James B. and Rosemary Flanigan in a stipulation filed with this Court on January 29, 1997. James and Margaret Delaney dismissed their claims against defendants Jean and Willie McCranie in a stipulation filed with this Court on June 5, 1998. Defendants Patsy DeLuca and Thomasina Falzerano died prior to commencement of the action, and Plaintiffs never served or located defendants Gloria Abrams and Marie Schmidt.

**3.** The Seventh cause of action was resolved separately and dismissed by stipulation prior to this motion. As far as this Court can determine, Plaintiffs never pleaded an Eighth cause of action.

**4.** Stockfield, Boniello, and Barile are sometimes referred to collectively as the "Lynlil Defendants."

are dismissed as moot in light of the Court's disposition of the federal claims against them. Cross claims for indemnity arising out of the state law causes of action are dismissed, but may be reasserted in the State Supreme Court if Plaintiffs refile there.

## C. Defendants' Counterclaims

Lynlil, MSSI, and Mantovi assert counterclaims against the Plaintiffs for indemnification and contribution under CERCLA. These counterclaims are dismissed with prejudice. The remaining counterclaims have not been addressed in any of the parties' briefings and are unaffected by the Court's various rulings. They consist of the following counterclaims against Plaintiffs: (1) frivolous prosecution of a RCRA claim, asserted by Lynlil, Stockfield, MSSI, Mantovi, and Putnam County; (2) frivolous prosecution of a CERCLA claim, asserted by Putnam County; and (3) cost recovery under CERCLA for Lynlil's expenses in investigating possible contamination at the DeLuca Farm and from constructing an alternate public water supply.

## D. Third–Party Action

The third-party contribution claims asserted by Lynlil and the Lynlil Defendants against Olga DeLuca, Elizabeth DeLuca, and Thomasina Christianson (the "Third–Party Defendants"), under CERCLA, 42 U.S.C. §§ 9607 & 9613(F)(1), are dismissed with prejudice.

## E. Third–Party Defendants' Cross Claims

The Third–Party Defendants brought cross claims for contribution and indemnity against Carmel, Putnam, Lynlil, the Lynlil Defendants, Mantovi, MSSI, Anthony DeLuca, and Theresa Miller. To the extent they seek contribution under CERCLA, these cross claims are moot and are dismissed with prejudice. To the extent they seek common law indemnity and/or contribution, these claims are dis-

missed, but may be reasserted in the State Supreme Court.

## II. Statement of Facts

On these dispositive motions, I construe all facts in favor of the Plaintiffs, who are the non-movants. See United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); Donahue v. Windsor Locks Bd. of Fire Commn'rs, 834 F.2d 54, 57 (2d Cir.1987). What follows, then, is a recitation of the case taken largely from the Plaintiffs' papers opposing the various motions that seek dismissal of their claims, supplemented as needed by uncontested facts from other presentations that are relevant to the issues before me.

## A. Septic Waste Dumping at the DeLuca Farm

The property that is the subject of this litigation consists of around 246 acres of land located within the Hamlet of Mahopac, Town of Carmel, County of Putnam, in the State of New York. (Aff. of Joel Sachs in Opposition to Defendants' Motion for Summary Judgment ("Sachs aff."), ¶ 3) Agor Lane, a public road in the Town of Carmel, bisects the property. Id. Philip and Mary DeLuca came to own this property, hereinafter referred to as the "DeLuca Farm," in 1944, and following Philip's death in 1966, Mary conveyed various portions to her children and grandchildren, including defendants Anthony DeLuca and Theresa DeLuca Miller (the "DeLuca Defendants"). (Id., ¶¶ 4, 6, 8) In 1986 and 1990, the DeLuca family members subsequently conveyed portions of the property to two corporate entities controlled by the Lynlil Defendants. (Id., ¶ 9)

In 1955, representatives of Defendant Town of Carmel contacted Philip DeLuca and sought to reach an agreement permitting the disposal of septic wastes on a portion of the DeLuca Farm property. (Id., ¶ 16) The Town Board met shortly thereafter and unanimously adopted a resolution authorizing the Town Supervisor " 'to sign an agreement with Philip DeLu-

ca, of Agor Lane, for permission to dispose of sewage waste on a parcel of his property, for the amount of $500.00 per year.' " (*Id.*, ¶ 16, quoting exh. 14 to dep. of Anthony DeLuca.) Around the time the lease terminated, in June 1960, the Town and Philip and Mary DeLuca executed an additional five-year lease to continue the " 'disposal [at the DeLuca Farm] of septic tank and cesspool waste' " collected in Carmel by Town-licensed scavengers. (*Id.*, ¶ 18, quoting exh. M to dep. of Michael Barile) This lease required Philip and Mary DeLuca to provide trenches for the disposal of septic waste on the DeLuca Farm. (*Id.*, ¶ 19) Then, when that lease expired in 1965, the Town Board renewed its five year lease with Philip and Mary DeLuca on similar terms, but at an increased rental rate. (*Id.*, ¶ 20)

Between 1955 and 1970, trenches were excavated within the leased area and were used for disposal of septic wastes by septic waste haulers. This area, consisting of some 10 acres of land located west of Agor Lane and south of the DeLuca farmhouse, is known as the "Site." (*Id.*, ¶ 21) A number of septic waste haulers used the Site for disposal of septic wastes on a daily basis from 1955 to 1970. (*Id.*, ¶ 22) During this same time period, the Town charged septic waste haulers an annual dump fee of $25 per tanker truck to dispose of septic wastes at the Town's septic dump located at the Site. (*Id.*, ¶ 25) Septic waste haulers had access to the Site by means of a dirt road extending from Agor Lane. Town employees occasionally maintained, improved, and snow plowed the dirt road during this period. (*Id.*, ¶ 27) Additionally, the road had a locking gate to which septic haulers who had paid their $25 annual fee would receive a key from the DeLuca family. (*Id.*, ¶ 28)

The final Town lease for use of the Site expired on June 15, 1970. However, the DeLucas permitted individual septic waste haulers to continue dumping for a number of years. (*Id.*, ¶ 41) Defendant Mantovi and Mahopac Sanitation (an unincorporat-

ed predecessor to corporate defendant MSSI) entered one such agreement with the DeLuca family for use of the Deluca Farm Site for dumping sewage through December 31, 1971. (*Id.*, ¶ 49) As part of the arrangement, Mantovi agreed to procure a permit from the Putnam County Board of Health and to maintain the sewage pits in accordance with Board of Health requirements. (*Id.*, ¶¶ 49–50)

Mahopac Sanitation, an unincorporated entity controlled by a father and son, Joseph C. Mantovi (who is not a party to this action) and defendant Joseph A. Mantovi, collected septic waste in Carmel between 1955 and 1974. (*Id.*, ¶ 29) Mahopac Sanitation applied for and received a license from the Town allowing it to dispose of septic waste at the Site, on an annual basis between 1955 and 1970. (*Id.*, ¶ 30) Joseph C. Mantovi and defendant Mantovi testified that Mahopac Sanitation, Mantovi Septic Systems, Inc., and a number of other septic waste haulers operating in Carmel disposed of large quantities of septic waste at the Site during this time period. (*Id.*, ¶ 31) Moreover, defendant Mantovi on some occasions personally pumped out the contents of septic tanks located in Carmel and disposed of the collected septic wastes at the Site. (*Id.*, ¶ 32) Mantovi testified that he never used any chemicals to clean septic tanks or his equipment. (Dep. of Joseph A. Mantovi at 28–29 ("Mantovi Dep."), excerpt attached to MSSI's and Mantovi's Memorandum of Law Supporting Motion for Summary Judgment) Defendant Mantovi bought Mahopac Sanitation from his father, in 1973, and subsequently transferred all books, records, and accounts to a successor corporation, defendant MSSI. (Sachs aff., ¶ 33)

### B. *Putnam County Department of Health Inspects the Site*

Defendant Putnam County had a Department of Health ("PCDOH") in the 1960's which maintained a list of septic haulers who used the Site during that time. (*Id.*, ¶ 35) A May 17, 1968 PCDOH

report from an inspection of the DeLuca Farm Site noted overflow from a sewage trench. (*Id.,* ¶ 36) The inspector instructed Mr. Patsy DeLuca (who was named as a defendant but died prior to commencement of this litigation) not to allow any trucks to dump their sewage until safeguards were constructed to prevent dumping in the leaking trench. (*Id.*) Mr. Raymond Johanson ("Johanson"), of PCDOH, conducted a reinspection of the Site the following week and, in his accompanying report, articulated the need for frequent inspections to prevent a recurrence of overflow. (*Id.,* ¶ 37)

Johanson inspected the Site on behalf of PCDOH three more times in 1968: on May 27, on June 14, and once more on July 17. (*Id.,* ¶¶ 38–40). Johanson reported that, during his June 14 inspection, he found that two disposal trenches had reached their full capacity and were close to overflowing into the adjoining field. (*Id.,* ¶ 39) At that time, Johanson directed Patsy DeLuca to discontinue use of the two filled trenches. (*Id.*) During his July 17 inspection, Johanson observed that another trench approached full capacity. He also noted that the main gate was no longer locked to prevent uncontrolled dumping. (*Id.,* ¶ 40) The record does not reflect any other Site inspections by Putnam County until May 12, 1975. (*Id.,* ¶ 55)

## C. *The Lynlil Defendants Develop the DeLuca Farm Site*

In the mid–1980's, defendants Barile and Boniello, two residential home builders in Carmel, sought assistance from a local attorney, defendant Stockfield, in forming a New York real estate development corporation that came to be known as Lynlil Land Development Corp. ("Lynlil"). (*Id.,* ¶¶ 56–58, 62) Barile and Boniello were at all times the officers, directors, and shareholders of Lynlil. (*Id.,* ¶ 63) Lynlil was formed for the purpose of acquiring and developing a portion of the DeLuca Farm for single-family residences. (*Id.,* ¶ 64) Stockfield also formed three other New York corporations related to development of residential housing at the DeLuca Farm: Lynlil Builders, Inc., for the purpose of constructing single-family homes; Agor East, Ltd. ("Agor"), for the purpose of acquiring and developing another portion of the DeLuca Farm; and Agor East Construction Corp. ("Agor Construction"), for the purpose of constructing single-family homes on that portion of the DeLuca Farm. (*Id.,* 1165, 67–68) Barile and Boniello were the officers, directors, and shareholders of Lynlil Builders, Inc. at all times; Stockfield, Barile, and Boniello were the officers, directors and shareholders of Agor and Agor Construction at all times. (*Id.,* ¶¶ 66–68)

In December 1986, a parcel of at least 100 acres of the DeLuca Farm was conveyed by various DeLuca family members to defendant Lynlil[5] in exchange for $583,000. (*Id.,* ¶ 76) The contract of sale was contingent upon Lynlil's obtaining subdivision approval from Carmel and Putnam to build not less than 49 one-family building lots on the parcel. (*Id.,* 73) Agor subsequently acquired from the DeLuca defendants an additional 25 acre parcel of the DeLuca Farm property to the north of Agor Lane (the "Agor subdivision"), in January 1990. (*Id.,* ¶ 101) On April 20, 1987, the Town granted conditional final subdivision approval to Lynlil for 44 residential building lots on the larger parcel, to be known as the "Farmview Estates" subdivision. (*Id.,* ¶ 91) The septic waste dump site previously leased to the Town is located on lots 42 and 43 of the subdivision purchased by Lynlil in 1986. (Third–Party Cplt., ¶ 25)

The Lynlil Defendants testified that they did not undertake any investigation, make any inquiry concerning conditions on the property, or retain the services of any

---

5. Lynlil says it was 100 acres and Plaintiffs say it was 172 acres but the dispute is of no

moment to resolving the instant motions.

engineer or other consultant to investigate the site conditions at any time prior to the closing of title on the Farmview Estates parcel. (Sachs aff., ¶ 75) Lynlil did, however, conduct a visual inspection of the property, a title search, and a review of the New York State Department of Environmental Conservation ("N.Y.S.D.E.C.")'s list of Inactive Hazardous Waste Disposal Sites. (Third–Party Cplt., ¶ 26) Upon purchase of the DeLuca Farm subdivision, Lynlil had no knowledge that hazardous substances, hazardous wastes, or solid wastes had ever been disposed of at the Site. (*Id.*, ¶ 27)

### D. *Plaintiffs Purchase Property at the DeLuca Farm.*

Beginning in September 1989, some of the thirty-two plaintiffs in this action entered into contracts with Lynlil and its affiliated builders to purchase single-family residential houses on the Farmview Estates subdivision of the old DeLuca Farm. (Sachs aff., ¶¶ 144–154) Each of the homes of these plaintiffs is connected to a community water supply known as "Water District 12" or the "Farmview Water Supply." (Decl. of Daniel Riesel in support of Lynlil's Motion for Summary Judgment ("Riesel decl."), ¶ 40) These plaintiffs allege that, at no time prior to the closings of title to any of the subject premises did the Lynlil Defendants provide any notice of well water or ground water contamination at the old DeLuca Farm. (Sachs aff., ¶¶ 155, 157) These plaintiffs allege further that the first notice they received of the former septic waste dump's presence at the Site was from a fact sheet distributed in January 1995 by the NYSDEC. (*Id.*, ¶ 164)

The remaining plaintiffs consist of two groups of individuals who own property outside of the subdivisions developed by the Lynlil Defendants and whose properties are served by individual private residential wells, rather than Water District 12 (hereinafter, the "Private Well Plaintiffs"). Among the Private Well Plaintiffs,

one group's wells have presented no chemicals or contaminants in excess of state or federal standards. (Riesel decl., ¶ 54) This group contends that hazardous substances allegedly contained at the Site will ultimately pollute their private wells. The second group of Private Well Plaintiffs has been advised by the PCDOH, the New York State Department of Health ("NYSDOH"), and the NYSDEC that their private wells are contaminated and that they should not drink, cook, or bathe with the water. (Aff. of James Delaney in Opposition to Defendants' Motion for Summary Judgment, ¶ 5(d)) These plaintiffs contend that the pollutants found in their private wells originated at the Site and result from the dumping activities at the DeLuca Farm. Both groups of Private Well Plaintiffs seek to hold the various defendants liable for actual and threatened contamination of their well water, as well as reduced property values resulting from the stigma allegedly caused by proximity to the Site.

Although the various groups of plaintiffs are distinguishable in terms of their respective contact with alleged contaminants, they all allege the same source of contamination and seek to impose liability upon the same defendants (except as discussed otherwise above). Thus, the same legal analysis governs all of the plaintiffs' claims and they will be addressed collectively in this opinion.

### E. *Lynlil Discovers the Septic Waste on its Subdivision*

Lynlil commenced development of the Farmview Estates subdivision in 1987. (Sachs aff., ¶ 93) In assessing the appropriate placement of septic systems on the new lots, Lynlil retained an engineering consultant firm that dug several test pits throughout the property, including two on lot 43, in 1988. (*Id.*, ¶ 93) On August 3, 1989, Gary Tretsch, Lynlil's engineer, learned from the PCDOH that lots 42 and 43 appeared to be "a former location scavenger dump site" which once existed on the DeLuca Farm Site. (*Id.*, ¶ 94) Accord-

ingly, PCDOH required that the well on lot 42 be tested for pollutants and semi-volatile compounds prior to issuance of a construction or building permit for the property. (*Id.*)

On November 9, 1989, Lynlil collected a groundwater sample from a residential water supply well on lot 42 that demonstrated levels of trichloroethene ("TCE") and vinyl chloride above the NYSDOH maximum contaminant levels for drinking water purposes (the "MCLs"). (*Id.*, ¶ 95) Lynlil provided these results to Putnam in January 1990. (*Id.*) Subsequent sampling at the Site by Lynlil and Putnam in January 1990 revealed widespread groundwater contamination in other proposed drinking water wells at the DeLuca Farm. Shortly thereafter, Barile learned from the PCDOH that water sampled from the lot 42 well showed levels of vinyl chloride and TCE in excess of the State MCLs. (*Id.*, ¶ 96) At that time, the PCDOH issued a "stop work order," suspending Lynlil's construction permits for the DeLuca Farm Site pending resolution of the water quality issue. (*Id.*)

At the PCDOH's direction, Lynlil hired a groundwater hydrogeologist and site assessment consultant to explore the possibility of installing a central public water supply. (*Id.*, ¶¶ 98–99; Third–Party Cplt., ¶ 31) Between January and March 1990, Lynlil and the PCDOH collectively sampled approximately 16 residential wells. (Third–Party Cplt., ¶ 30)

On February 7, 1990, the Lynlil Defendants met with John Karell, of the PCDOH, to discuss Lynlil's proposal to install a central public water supply system on the Agor subdivision. (Sachs aff., ¶ 101; Third–Party Cplt., ¶ 32) Karell advised Lynlil's engineer on June 25, 1990 that the PCDOH was approving the public water system to be known as "Water District 12" or the "Farmview Water Supply." (Sachs aff., ¶ 119) Upon completion of the water supply system, Lynlil transferred its ownership and operation of Water District 12 to the Town in 1992. (Third–Party Cplt., ¶ 33)

Lynlil stopped paying taxes on lots 42 and 43 in January 1991, when it learned that houses could not be built on those lots. (Sachs aff., ¶ 180 & exh. 115; aff. of William J. Carlin, attached to Putnam County's Notice of Motion for Summary Judgment, ¶ 6) These lots were then sold by Putnam at a tax foreclosure sale in December 1991. (Sachs aff., ¶ 182) The New York Secretary of State subsequently dissolved Lynlil for tax delinquency, pursuant to N.Y. Tax Law § 203–a, by proclamation on or about December 28, 1994. (Sachs aff., ¶ 181; exh. 116 to Sachs aff.)

III. *Procedural Background*

Plaintiffs filed the complaint in this action on April 19, 1996. Plaintiffs amended the complaint three times, filing the current version, the Third Amended Complaint (hereinafter the "Complaint"), on February 11, 1998. After various stipulations of discontinuance, there are ten remaining defendants: Town of Carmel, Putnam County, Lynlil Land Development Corp., Howard Stockfield, Thomas Boniello, Michael Barile, Joseph Mantovi, Mahopac Septic Sanitation, Inc., Anthony DeLuca, and Theresa Miller.

Lynlil and the Lynlil Defendants filed their answer and counterclaim, as well as a cross claim against Carmel on June 6, 1996. Lynlil and the Lynlil Defendants also filed a third-party complaint against Olga DeLuca, Elizabeth DeLuca, and Thomasina Christianson, and various Jane and John Does on August 1, 1996.[6] Putnam filed its answer and counterclaim, as well as cross claims against Carmel, Lynlil, and MSSI on June 17, 1996. MSSI filed a cross claim against Carmel, Putnam, Lynlil, and the DeLuca Defendants, as well as a counterclaim against the Plaintiffs and Lynlil, on August 14, 1996. Carmel filed its answer and a cross claim against Put-

---

**6.** The third-party plaintiffs also listed Christina DeLuca Finch in the caption, but were unable to locate or serve her with the complaint.

nam, MSSI, and the DeLuca Defendants on September 10, 1996. Carmel also asserted cross claims against the Third–Party Defendants on November 21, 1996, and against Putnam, Lynlil, the Lynlil Defendants, MSSI, and the McCranie and Flanigan plaintiffs on January 7, 1997.

The Third–Party Defendants moved on February 4, 1997 for summary judgment dismissing the third-party complaint. Mantovi and MSSI moved for summary judgment dismissing the complaint on February 7, 1997. Lynlil and the Lynlil Defendants also moved for summary judgment on February 7, 1997, as did Putnam and Carmel. The DeLuca Defendants served a motion for summary judgment upon all of the parties to this action, but never filed their motion papers with this Court.[7] All of the motions have been opposed, supplemented, and briefed extensively over the two intervening years.

## IV. Legal Analysis

### A. Putnam County

1. *Putnam County's Motion to Dismiss Plaintiffs' CERCLA Claim for Liability as an Operator and Former Operator of the Site, is Granted.*

(a) *Whether Putnam County Has or Had Legal Title to the Site Need Not Be Resolved.*

The various complaints filed by Plaintiffs in this matter have all alleged that Putnam County is liable under CERCLA and RCRA as the legal owner of the contaminated lots on the DeLuca Farm Site.

As discussed above, Lynlil took title to the Farmview Estates subdivision, which contained the Site, in 1986. In January 1991, Lynlil ceased paying real property taxes on the two-lot Site, after learning that it could not build houses on that parcel. The two-lot parcel thereby became eligible for tax foreclosure. Putnam sent notices to owners and published notices in newspapers in the fall of 1991 that all similarly situated properties would be included in a tax lien sale if the delinquent owners did not redeem the liens. (Aff. of William J. Carlin ("Carlin aff."), attached to Putnam's Notice of Motion, ¶ 6) Putnam County Commissioner of Finance, William J. Carlin ("Carlin"), purchased the tax liens on behalf of Putnam on December 20, 1991. (Carlin aff., ¶ 7) In the Fall of 1992, Putnam again sent and published notices advising owners of property with delinquent taxes that the liens sold on December 20, 1991 could be redeemed before December 21, 1992, at which point they would expire. (*Id.*, ¶ 8)

Putnam sent another notice to delinquent property owners in December 1994, advising them that a tax lien had been sold on their property and instructing them to contact the Putnam County Finance Department to redeem the lien. (*Id.*, ¶ 9) Finally, on March 1, 1995, Carlin executed a Tax Deed, which recorded the interest Putnam County had acquired in properties pursuant to the tax delinquency sale held on December 20, 1991. (*Id.*, ¶ 10) This document is, curiously, referred to as the "1994 Tax Deed." (*Id.*, ¶ 5 n. 1) The 1994 Tax Deed included a twelve-page list of 90 parcels of land on which taxes had become delinquent, including the Site, lots 42 and 43 in Lynlil's Farmview Estates subdivision. (Exh. 1 to Carlin aff.)

---

**7.** The voluminous chambers file I received from the three judges who successively presided over this case offers no explanation for why the original, signed motion papers contained therein have never been docketed by the Clerk of Court, although the Plaintiffs' papers opposing the motion were. As with so many other things about the procedural history of this case, there will be no answer to the question. The original motion papers were

delivered to the Court and responded to by Plaintiffs; accordingly, I have considered the motion, its supporting papers, and Plaintiffs' opposition without requiring the defendants to re-submit their motion to the Clerk's Office. I have also arranged for the motion to be docketed *nunc pro tunc* as of February 7, 1997. Given the fact that all parties received the motion, it cannot be argued that any party has been prejudiced in any manner.

Since 1991, Putnam County's Finance Department has refused to take title to properties containing potential environmental hazards. (Carlin aff., ¶ 12) To that end, the Finance Department obtains input from the PCDOH concerning potentially contaminated properties. (*Id.*, ¶ 13–15) After reviewing the 1993 Tax Deed (precursor to the 1994 Tax Deed) and concluding that none of the properties listed therein contained environmental hazards, PCDOH Director Karell sent the Finance Department a list of "contaminated properties," including the DeLuca Farm Site, for reference in future tax delinquency sales. (*Id.*, ¶ 15, exh. 4) If the Finance Department had done its job correctly, the Site would have been stricken from the subsequent 1994 Tax Deed property list, which, as discussed above, listed all the properties that were to be included on the Tax Deed to be executed by Putnam on March 1, 1995. Someone erred, however, and the DeLuca Farm Site remained on the 1994 Tax Deed property list. It was, therefore, listed on the March 1, 1995 document (the aforementioned 1994 Tax Deed), which, once executed, was duly recorded by the Putnam County Clerk.

The mistake was discovered almost immediately. On April 11, 1995, six weeks after the initial 1994 Tax Deed was recorded, Putnam County executed a Correction Deed, which omitted the Site from the list of properties taken by Putnam. (Carlin aff., ¶ 18) That deed was recorded on April 12. (Exh. 2 to Carlin aff.) Putnam County never commenced any "bar claim" procedure to perfect its tax title as required by New York Real Property Tax Law (Article 10, Title 5) and Real Property Actions and Proceedings Law (Article 15). In fact, the presumption of regularity had not yet attached to the tax sale when the Correction Deed was recorded. *See* N.Y. Real Prop. Tax Law § 1020(3) (McKinney 1989).

(b) *State Law Governing the Ultimate Effect of Putnam County's Correction Deed is Unsettled.*

Putnam County indisputably divested Lynlil of title and became the legal "owner" of the Site on March 1, 1995. Article 10 of the Real Property Tax Law denominates a tax district that takes title pursuant to a sale for delinquent taxes under that article as "the owner" of said property. *See* N.Y. Real Prop. Tax Law § 1084(1) (McKinney 1989).[8] It is true that Putnam did not and does not today have certain of the incidents of ownership due to its bare paper title. For example, until the conclusion of a lengthy bar claim procedure and a redemption period, a municipal owner by Tax Deed does not enjoy any right to possess the property. *See, e.g., Bodinger v. Garrison,* 250 A.D. 463, 294 N.Y.S. 916 (2d Dep't 1937). Putnam County, having discovered its error in taking bare-bones title, never instituted such a proceeding and thus has not at any time had any right of usufruct. But, at least for a few weeks, it had title, and it may have bare title yet.

Putnam County argues that issuance of the Correction Deed nullified the grant of land made pursuant to the original Tax Deed, and that the Correction Deed superceded the original grant. Plaintiffs (and Lynlil as well) contend that Putnam Coun-

---

8. *See also* § 1008(1), which provides that:
All counties of the state are empowered to acquire and hold lands sold at tax sale. Purchases by the county shall be subject to the same right of redemption as purchases by individuals. If a parcel sold to the county is not redeemed, the deed therefor shall have the same effect and become absolute in the same time and upon the same conditions as in the case of a conveyance to an individual.

N.Y. Real Prop. Tax Law § 1008(1) (McKinney 1989). The Court notes that section 1008(1) was repealed by statute, effective January 1, 1995; however, its provisions continued in effect for four years for the purposes of enforcing prior tax liens. *See* N.Y. Real Prop. Tax Law § 1008 (McKinney Supp.1999), Historical and Statutory Notes. In the instant case, Putnam County purchased the tax liens in December 1991, so section 1008(1) still applies.

ty has been the owner of the land since March 1, 1995, and that no new deed issued from Putnam to Putnam can retract that taking.

There is absolutely no law on point. Putnam County argues that its position is supported by the (predictably ancient) decision of the New York Court of Appeals in *People v. Tompkins–Kiel Marble Co.*, 269 N.Y. 77, 82–83, 199 N.E. 10 (1935). In that case, the Court of Appeals held that a Correction Deed could issue to grant a grantee a lesser interest than he had obtained under a prior deed, and further held that such a Correction Deed wholly supercedes the prior deed, so that acceptance of the new deed by the grantee cancels *ab initio* any title to the property removed from the new deed. If Lynlil, as prior grantor, had issued the deed to the DeLuca Farm Site in error, and later retracted same and issued a Correction Deed, these ancient principles would control the question of ownership.

However, it appears that the Court of Appeals may have limited application of this doctrine to situations where the new deed was a confirmatory patent, "one which makes certain that which before was uncertain." *Tompkins–Kiel*, 269 N.Y. at 88, 199 N.E. 10 (Crane, C.J., concurring). And New York's high court never considered the question of whether a sovereign, *taking* property rather than having property *granted* to it by another, could "correct" its own mistake by issuing a new deed to itself. The entire tenor of the *Tompkins–Kiel* opinion is that "where the grantee requests and receives from the state [who in that case was the *grantor*] a new deed which removes defects, restrictions, or doubts as to his title, the rights of the parties are conclusively determined by the last deed." *Tompkins–Kiel*, 269 N.Y. at 83, 199 N.E. 10. The opinion goes on to state that the grantee's acceptance of a

new grant is an admission that, prior thereto, title to the property granted lay with the grantor. Since there is no grantor in a tax foreclosure (the State taking by purchase pursuant to statute), *Tompkins–Kiel* is, by its terms, inapposite, and it is an open question whether the correction deed had any effect.

In other circumstances, that open question would loom large. However, it turns out to be unimportant here, because it does not affect the ultimate disposition of this matter as to either Putnam or Lynlil. Therefore, I leave this fascinating and esoteric question for another day—and, I hope, for another judge—and turn to the issues that are determinative of Putnam County's "ownership status" under CERCLA and RCRA.[9]

(c) *Regardless of Whether Putnam County is or was the Legal Owner of the Site, It Is Not a Responsible or "Covered" Person Under CERCLA.*

CERCLA imposes liability on responsible parties, or "covered persons," which is a term defined under the statute to include four categories of individuals or entities. *See* 42 U.S.C. § 9607(a)(1 – 4) (1995). In this case, Plaintiffs purport to rely on two of the four classes of "covered persons" to hold Putnam liable:

(1) [T]he [current] owner and operator of a vessel or a facility,

(2) [A]ny person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of

42 U.S.C. § 9607(a).

Unfortunately for plaintiffs, Putnam County is neither.

---

9. This Court presumes familiarity with the obligatory recitations on CERCLA's "broad remedial" purpose and RCRA's aim "to reduce the generation of hazardous waste and to ensure [its] proper treatment," as included in virtually every opinion applying these statutes. *See, e.g., Prisco v. A & D Carting Corp.*, 168 F.3d 593, 602, 608 (2d Cir.1999).

**(i) *Putnam County is not the Current Owner and Operator Under CERCLA.***

■ Assuming *arguendo* that Putnam has legal title to the DeLuca Farm Site today, it is nonetheless exempt from CERCLA liability because its interest does not fall within CERCLA's definition of "ownership." CERCLA specifically shields from liability municipalities that take title or control of property "... due to bankruptcy, foreclosure, tax delinquency ..." 42 U.S.C. § 9601(20)(D). There is absolutely no dispute that Putnam took whatever interest it has or may have had in the land in a tax delinquency foreclosure sale that occurred long after the disposal of the allegedly hazardous substances. To the extent that Putnam took paper title to the Site, it did so in the guise of a secured creditor and nothing more; there is no relationship whatever between its ownership interest and the disposal activities at the site. Thus, Putnam is not an "owner" of the Site for CERCLA purposes. *See, e.g., U.S. v. Carolawn Co., Inc.,* 698 F.Supp. 616, 622 (D.S.C.1987), *aff'd sub nom. U.S. v. Dart Indus., Inc.,* 847 F.2d 144 (4th Cir.1988); *In Re Bergsoe Metal Corp.,* 910 F.2d 668, 671 (9th Cir.1990); *Snediker Developers Ltd. Partnership v. Evans,* 773 F.Supp. 984, 987–87 (E.D.Mich. 1991) (citing *Bergsoe* ).

Moreover, there is nothing in this record to support an inference that Putnam is currently operating the Site; indeed, there is no such allegation, since it is beyond cavil that no one is operating the Site as a waste disposal facility. Therefore, Putnam cannot be deemed a covered person under 42 U.S.C. § 9607(a)(1).

**(ii) *Putnam County was not a Site Operator During the Dumping.***

■ Plaintiffs are equally unable to hold Putnam liable as a party who either owned or operated the Site at the time of waste disposal thereon, as provided by 42 U.S.C. § 9607(a)(2).

Plaintiffs identify two activities of Putnam County that allegedly qualify it as an operator of the Site during the relevant period: Putnam "approved and controlled the utilization of the Site for disposal of hazardous substances" by regulating use of the DeLuca Farm by private septic waste haulers,[10] and Putnam acted as the "Lead Agency" pursuant to the New York State Environmental Quality Review Act ("SEQRA"), N.Y. Envtl. Conserv. Law Art. 8 (McKinney 1997), assuming primary responsibility in August 1990 for evaluating whether the construction of a proposed well field would have a significant impact on the environment.[11] That is, Plaintiffs contend that Putnam initially regulated the use of the Site for disposal of septic waste and, years later, orchestrated the environmental review to assess the implications of locating a public water source near the Site. However, it is well settled that a municipality whose actions were taken in furtherance of its sovereign or regulatory functions is not deemed an "operator" of a Site for CERCLA purposes.[12] The activities attributed to Putnam by Plaintiffs fall squarely within that category.

**10.** *See* Cplt., ¶¶ 36, 63. *See also* 42 U.S.C. §§ 9601(20(A) (defining "operator") & 9607(a)(2) (defining "covered person").

**11.** *See* Cplt., ¶ 40; Third–Party Cplt., ¶¶ 30–33; Lynlil Rule 3G Statement, ¶ 21.

**12.** *See, e.g., United States v. Dart Indus., Inc.,* 847 F.2d 144, 146 (4th Cir.1988) (holding inadequate enforcement of state environmental regulations insufficient to constitute CERCLA ownership or control); *Stilloe v. Almy Bros., Inc.,* 782 F.Supp. 731, 736 (N.D.N.Y.1992) (CERCLA plaintiff failed to prove that New York State Department of Environmental Conservation acted outside its regulatory capacity); *United States v. Azrael,* 765 F.Supp. 1239, 1246 (D.Md.1991) (dismissing CERCLA counterclaims that were based on municipal defendant's participation in emergency clean-up); *United States v. Western Processing Co., Inc.,* 761 F.Supp. 725, 729 (W.D.Wash.1991) (dismissing contribution claims because government acting in its regulatory capacity was not a site "operator").

Putnam's alleged activities are no different than those alleged to have been performed by the Department of Health in *Carolawn, Co., Inc., supra,* where the plaintiff complained that the South Carolina Department of Health and Environmental Control ("DHEC") had negligently failed to enforce codes and regulations in monitoring clean-up at a waste storage site. *Id.,* 698 F.Supp. at 618–19. There, plaintiff contended that the state agency had "controlled the activities" at the waste site when it "approved or disapproved" applications to store waste. *Dart Indus.,* 847 F.2d at 146 (reviewing *Carolawn* on appeal). The *Carolawn* District Court dismissed the complaint, holding that plaintiff had failed to allege a valid claim and, on appeal, the Fourth Circuit (reviewing the case under a different name) agreed, concluding that even inadequate enforcement of state environmental regulations did not render the DHEC an "operator" of the site for CERCLA purposes. *Id.*

Since Putnam County does not qualify as a "responsible person" under CERCLA, Plaintiffs' claims against it must be dismissed.

2. *Putnam County's Motion to Dismiss Plaintiffs' RCRA Claim is Granted, Because the Law is Clear that Putnam County has no Liability under RCRA.*

To impose liability under RCRA, Plaintiffs must demonstrate that Putnam County

(1) is a "person"

(2) who "contributed . . . to the past or present handling, storage, treatment, transportation or disposal . . ."

(3) of any "solid or hazardous waste that may present an imminent and substantial endangerment to health or the environment"

42 U.S.C. § 6972(a)(1)(B); *see also ABB Indus. Sys., Inc. v. Prime Tech., Inc.,* 120 F.3d 351, 359 (2d Cir.1997).

■ Putnam County is indeed a "person," as defined by RCRA, but that is the only prong of the statutory definition Plaintiffs can satisfy.

■ Just as Putnam is neither an owner nor an operator of the Site under CERCLA, it is neither under RCRA, irrespective of whether it is the owner of the property under New York law. Congress provided, in clear statutory language, that RCRA should apply to persons who create solid waste, dispose of it, transport it or otherwise handle the waste. *See Zands v. Nelson,* 779 F.Supp. 1254, 1263–64 (S.D.Cal. 1991).[13] Congress did not define the phrase "contribute to," but there is not a shred of evidence that Putnam County ever created, disposed of, stored, treated or handled waste in any manner on the DeLuca Farm. Plaintiffs contend that their papers raise an issue of fact in this regard, but they clearly do not. Therefore, Plaintiffs' RCRA claim must be dismissed.

3. *This Court Declines to Exercise Pendent Jurisdiction Over Plaintiffs' Remaining State Claims Against Putnam County.*

The remaining claims against Putnam are all state common law claims, sounding in environmental trespass, negligence and

---

13. *See also* 42 U.S.C. § 6903(3) (defining "disposal"), 6903(33) (defining "storage"), & 6903(34) (defining "treatment"). *See also* H.R.Rept. No. 1016, Part I, 96th Congress, *reprinted in* 1980 U.S.Code and Admin. News 6119, 6120. Where the statute does not specifically define its terms—such as "transportation" or "handling"—the courts apply the commonly held meaning of those terms. *Cf. Hallstrom v. Tillamook Cty.,* 493 U.S. 20, 31, 110 S.Ct. 304, 107 L.Ed.2d 237 (1989) (adopting plain language meaning for RCRA notice requirement); *see also Vermont v. Staco, Inc.,* 684 F.Supp. 822, 835 (D.Vt.1988) (applying "handling"); *Zands v. Nelson,* 779 F.Supp. 1254, 1264 (S.D.Cal.1991) (citing Random House dictionary definition of "contribute": "to be an important factor in; help to cause"). Plaintiffs have presented no evidence that any employee or agent of Putnam ever handled or transported any solid or hazardous waste at the Site.

public and private nuisance. Putnam contends that they are time-barred due to Plaintiffs' failure to file a timely notice of claim against Putnam, as required by N.Y.C.P.L.R. § 214–c(3) and its incorporation of N.Y.Gen.Mun.Law §§ 50–e and 50–i.

Putnam is correct that Plaintiffs were required to file a notice of claim. Under New York law, a plaintiff who wishes to sue a municipality (including a county, *see* N.Y. County Law § 52 (McKinney 1991))[14] must serve a notice of claim, personally or by certified mail, directly on the municipality, within ninety days after the claim arises. *See* N.Y.Gen.Mun.Law §§ 50–e[15] & 50–i (McKinney 1986).[16] Viewing the record most favorably to Plaintiffs, they became aware of Putnam's alleged environmental trespass, negligence or nuisance no later than the date they served Putnam with their RCRA Notice of Intent to Sue— July 24, 1995. No notice of claim was ever

served personally on Putnam, as required by law. Such notice must be served within 90 days after the claim arises. And while a notice was delivered to Putnam's counsel, it did not come until December 17, 1996— over one and one half years after the last possible date the Plaintiffs could have become aware of their claims.

Plaintiffs did, however, serve a Notice of Intent to Sue under RCRA upon Putnam within the time required by sections 50–e and 50–i, and that notice may well have contained sufficient information to constitute notice of a claim to the County within the meaning of General Municipal Law 50–e.[17] *Cf. Miller v. Liberty Lines*, 208 A.D.2d 454, 454, 617 N.Y.S.2d 471, 472 (1st Dep't 1994) (finding that timely submission of no-fault claim form to defendant company contained sufficient information to satisfy section 50–e(2)'s requirements). However, as I decline to exercise pendent jurisdiction over the

**14.** N.Y. County Law § 52 provides that:
Any claim or notice of claim against any county for damage ... or for invasion of personal or property rights, of every name and nature, and whether causal or continuing trespass or nuisance and any other claim for damages arising out of law or in equity, alleged to have been caused or sustained in whole or in part by or because of any misfeasance, omission of duty, negligence or wrongful act on the part of the county, its officers, agents, servants or employees, must be made and served in compliance with section fifty-e of the general municipal law.
*Id.*, § 52(1).

**15.** N.Y.Gen.Mun.Law § 50–e provides, in pertinent part, that:
[i]n any case founded upon tort where a notice of claim is required by law as a condition precedent to commencement of an action or special proceeding against a public corporation ... the notice of claim shall comply with and be served in accordance with the provisions of this section within ninety days after the claim arises.
*Id.*, at § 50–e(1)(a).

**16.** N.Y.Gen.Mun.Law § 50–i provides, in pertinent part, that:
it shall appear ... in the complaint or moving papers that at least thirty days have

elapsed since the service of such notice ... and [ ] the action or special proceeding [requiring a notice of claim] shall be commenced within one year and ninety days after the happening of the event upon which the claim is based....
*Id.*, at § 50–i(1)(c).

**17.** N.Y.Gen.Mun.Law § 50–e(2) requires that the notice shall be written, sworn to by or on behalf of the client, and contain the following information:
(1) the name and post-office address of each claimant, and of his attorney, if any; (2) the nature of the claim; (3) the time when, the place where and the manner in which the claim arose; and (4) the items of damage or injuries claimed to have been sustained so far as then practicable ...
*Id.* As noted above, section 50–i requires that the claimant serve the notice of claim thirty days before serving a complaint and that the action shall be commenced within one year and ninety days of the alleged event.
Plaintiffs' RCRA Notice of Intent to Sue, served on July 24, 1995, identified each of the Plaintiffs and contained a detailed description of the time when, the place where, and the manner in which the Plaintiffs' claim arose. Plaintiffs then waited more than thirty days to file their complaint on April 19, 1996.

purely state claims,[18] this question of state procedural law is more appropriately addressed by a state court.

Putnam's motion for summary judgment dismissing Plaintiffs' claims is denied with respect to the state law claims. Those claims are dismissed without prejudice to re-filing in state court. Plaintiffs' federal claims against Putnam County are dismissed with prejudice.

### 4. *Putnam County's Counterclaims for Frivolous Prosecution of RCRA and CERCLA Claims are Still Pending.*

Putnam asserted counterclaims against the Plaintiffs for frivolous prosecution of RCRA and CERCLA claims. As no party has moved for summary judgment on any of the counterclaims or even briefed them, and as Putnam's counterclaims are not mooted by the Court's other determinations, these claims remain before me.

### B. Lynlil and the Lynlil Defendants

#### 1. *Lynlil Is Not Liable Under CERCLA.*

Lynlil was indisputably an owner of the DeLuca Farm. It purchased the property containing the Site in 1986 from various DeLuca family members, including the DeLuca Defendants, and proceeded to develop it. It lost title to the property for at least a few weeks when Putnam bought the land in tax foreclosure, and it may thereby have lost legal ownership of the site altogether (*see* § III(A)(1)(a) –(b), *supra*). Regardless, Lynlil cannot be deemed a "responsible party" under CERCLA.

Lynlil cannot be held liable under section 9607(a)(2) because it neither owned nor operated the DeLuca Site at the time hazardous substances were dumped there. It purchased the property in 1985, some 15 years after the dumping ceased.

There is no contention that Lynlil or the Lynlil Defendants either arranged for the dumping of hazardous substances or accepted same, and there is no evidence in this record that would support any such contention if it had been made. Thus, sections 9607(a)(3) and (4) are inapplicable as well.

The only possible source of liability for Lynlil, then, is as an "owner and operator of a . . . facility" under section 9607(a)(1). This, of course, brings us back to the infamous Putnam County Correction Deed. If the Correction Deed did not divest Putnam of the title it acquired in the tax foreclosure sale, then Lynlil cannot qualify as the "owner and operator of a . . . facility" under section 9607(a)(1), because Putnam, in fact, legally owns the place.

Assuming that the Correction Deed *was* effective, Lynlil would be the current owner of the Site and potentially a responsible person under CERCLA. *See* 42 U.S.C. § 9607(a)(1) ("the owner and operator of a . . . facility"). Notwithstanding subsection (a)(1)'s conjunctive phrasing—"owner *and* operator"—many courts have construed its requirement in the disjunctive, finding persons responsible for CERCLA clean-up costs if they owned *or* operated the facility at the time the plaintiff filed the complaint. *See, e.g., United States v. Fleet Factors Corp.,* 901 F.2d 1550, 1554 n. 3 (11th Cir. 1990) (ascribing the semantic confusion to "careless statutory drafting") (citing cases).

If Lynlil is the current owner, it would be strictly liable despite the fact that it did not own the Site at the time of disposal of hazardous substance; as this Circuit has recently observed, CERCLA "imposes strict liability without regard to causation on parties who fall within at least one of the four categories of potentially responsible persons." *Bedford Affiliates v. Sills,* 156 F.3d 416, 425 (2d Cir.1998). However, Lynlil can escape liability if it can satisfy

---

18. *See* 28 U.S.C. § 1367(c); *see also, Walker v. Time Life Films, Inc.,* 784 F.2d 44, 53 (2d Cir.1986); *Irish Lesbian and Gay Organiza-* tion *v. Bratton,* 882 F.Supp. 315, 321 (S.D.N.Y.1995).

one of CERCLA's affirmative defenses, as set forth in § 9607(b). *See New York v. Lashins Arcade Co.,* 91 F.3d 353, 359 (2d Cir.1996); *United States v. Alcan Aluminum Corp.,* 990 F.2d 711, 721 (2d Cir. 1993). As it happens, CERCLA protects Lynlil from liability, just as it did Putnam. In Lynlil's case, the applicable provision is the so-called "third-party defense." *See* 42 U.S.C. § 9607(b)(3).

Recognizing that persons could become entangled in CERCLA's liability net through no fault of their own, Congress carved out several defenses to the CERCLA liability, one of which protects innocent third-party purchasers who had nothing to do with the release of hazardous substances onto the property. This defense reads as follows:

> There shall be no liability under subsection (a) of this section [9607] for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by ... (3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant ... if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions....

42 U.S.C. § 9607(b)(3).

The third-party defense is available to a party who, like Lynlil, acquired a piece of contaminated property years after disposal of substances ceased. *See, e.g., Lashins Arcade,* 91 F.3d at 359. While Plaintiffs try valiantly to convince me that there are disputed issues of material fact touching on Lynlil's invocation of the third-party defense, a fair reading of the record compels the conclusion that no reasonable juror could do anything other than give Lynlil the benefit of that defense. Accordingly, Lynlil's motion for summary judgment dismissing Plaintiffs' CERCLA claim must be granted.

First, there is no dispute that the Site was contaminated by parties other than the Lynlil Defendants. Plaintiffs do not contend that Lynlil was responsible for the presence of any hazardous substance on the DeLuca Farm. Indeed, they concede in their own papers that Lynlil could do nothing about the dumping, since the dumping concluded many years before the developers purchased the Site. *See* Cplt., ¶¶ 37–38; Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment ("Pls.' Br.") at 97. Their attempts to hold Lynlil liable as the current owner, relying on the authority of *New York v. Shore Realty Corp.,* 759 F.2d 1032 (2d Cir.1985), are unpersuasive and unavailing in light of the controlling ruling of the Court of Appeals in *Lashins Arcade, supra.*

Second, it is well settled that the acts or omission that caused the release of hazardous substances—here, the dumping of septic waste—did not occur in connection with any contractual relationship between Lynlil and those who were responsible for the dumping. Under controlling Second Circuit case law, Lynlil's contract to purchase the DeLuca Farm from the DeLuca family members does not create the kind of "contractual relationship" that would deprive Lynlil of its third-party defense, as the purchase agreement does not "relate to the hazardous substances or allow the landowner to exert some element of control over the third party's [here, the DeLucas]'s activities." *Lashins Arcade,* 91 F.3d at 360. *See also Westwood Pharmaceuticals, Inc. v. Nat'l Fuel Gas Distrib. Corp.,* 964 F.2d 85, 91–92 (2d Cir.1992); *Shapiro*

*v. Alexanderson,* 743 F.Supp. 268, 271 (S.D.N.Y.1990) ("[t]he act or omission must occur in a context so that there is a connection between the acts and the contractual relationship").

Contrary to Plaintiffs' argument, *Lashins Arcade* is factually indistinguishable from the instant case; in both matters, the innocent purchaser who sought to rely on the third-party defense bought the land from someone who was actually connected to the release of the allegedly hazardous substances. If the *Lashins Arcade* purchaser was entitled to the defense, then Lynlil is as well. By contrast, in *United States v. A & N Cleaners & Launderers, Inc.,* 854 F.Supp. 229 (S.D.N.Y.1994), the case relied on by Plaintiffs, the party who sought to avail himself of the third-party defense was the record owner of the property during the entire period of offending conduct, and the actual dumper was his sublessee. *See also Lashins Arcade,* 91 F.3d at 362 (distinguishing *A & N Cleaners* based on defendant's ownership during the period of violation). There are no similar facts before me.

Third, since Lynlil purchased the DeLuca Farm property some 15 years after the dumping ended, there was nothing it could have done to prevent the action—dumping—that led to the release of allegedly hazardous substances. Thus, it cannot have violated any statutory duty to take "adequate precautions" to *prevent* the prior owners and those with whom they contracted from dumping septic waste on the Site. *See Lashins Arcade,* 91 F.3d at 360.

Finally, there is no disputed issue of fact as to Lynlil's exercise of due care with respect to the hazardous substances in light of all relevant facts and circumstances. Lynlil first became aware of the possibility of contaminants at the Site in 1989, when it was advised of same by the PCDOH. Plaintiffs assert that Lynlil learned of the Site's location on or about December 4, 1985, when Town of Carmel Planning Board member Leo Saluto advised Lynlil engineer, Gary Tretsch, that the old septic dump was on the parcel Lynlil wished to develop. A Gannett newspaper article appearing the following day allegedly confirmed that Lynlil's construction plans were designed to avoid disturbing the old dumping area. (Sachs aff., ¶¶ 81–84) But Lynlil maintains that it had no reason to know this long-dormant septic waste dump posed any sort of environmental threat until August 1989, when the PCDOH required testing of the well on lot 42 in response to a third-party complaint. These tests revealed volatile organic compounds, including TCE and vinyl chloride, that are not ordinarily found in *septic* waste. (Riesel decl., ¶ 13)

Therefore, even if Lynlil knew, prior to August 1989, that the DeLuca Farm contained an old septic waste dump, that would not be enough to take the CERCLA claims against Lynlil to a jury. Plaintiffs point to nothing in the record which demonstrates that Lynlil (or the Lynlil Defendants) knew that the septic waste contained hazardous, non-septic substances.

Once the PCDOH alerted Lynlil to the possibility of contaminants, Lynlil arranged for the drilling and testing of wells. Finding contaminants in one of them, it promptly performed all of the environmental sampling that any governmental agency required. Lynlil built an alternate community water system for its subdivision and two adjacent lots, which was approved by the State Department of Environmental Conservation, the State Department of Health, and the PCDOH. This water system, constructed at a cost of more than $600,000,[19] has been providing the site with clean water ever since. The Site now meets the levels prescribed by New York State soil clean-up guidelines for the protection of groundwater, as listed in the Technical and Administrative Guidance Memorandum ("TAGM") 4046. (Decl. of Karen Leo in support of Lynlil's Motion for Summary Judgment ("Leo decl."), ¶ 2h;

---

**19.** *See* Dep. of Michael Barile, addendum to Riesel decl., at 244–45.

Keating depo., attached as addendum to Leo decl., at 92–94) The water from this system, which is monitored quarterly, has never deviated from New York state or federal regulatory standards for safe drinking water. (Riesel decl., ¶¶ 29, 36, 50) Moreover, none of the compounds detected in samples from the community water system were "indicator chemicals" correlating to substances known to exist in the Site. In other words, testing has not demonstrated that any pollutants that have been identified at the old septic dump have migrated into the community water system. Plaintiffs' own expert so admits. (Dep. of William Seevers, attached as exh. N to Riesel decl., at 97–98)

Plaintiffs' suggestion (and it is nothing more than that) that the well field *could* become contaminated at some point in the future is pure speculation; it raises no genuine issue of fact so as to defeat the motion for summary judgment. Similarly, their argument that Lynlil had a duty to detect the contamination prior to purchasing the property (so-called "pre-purchase due care") has been rejected repeatedly by courts confronted with the same argument in § 9607(b)(3) third-party defense cases.[20] *See, e.g., Lashins Arcade,* 91 F.3d at 361; *HRW Systems, Inc. v. Washington Gas Light Co.,* 823 F.Supp. 318, 349 (D.Md. 1993). *See also* Joel H. Sachs, *Second Circuit Sustains Third–Party Defense to CERCLA Liability,* Vol. 16, No. 4, The New York Environmental Lawyer, NYS-BA (Fall 1996), 14, 16.

Thus, Plaintiffs' CERCLA claim against Lynlil must be dismissed. It is not necessary to reach any of Lynlil's arguments concerning the lack of incurrence of response costs by certain Plaintiffs.

**20.** By contrast, there is a duty of pre-purchase due care when the defendant purchaser invokes the "innocent land owner" defense under § 9601(35)(B), a separate and distinct defense on which Lynlil does not rely.

**21.** Stockfield *was* an officer, director, and shareholder of Agor—along with Barile and Boniello—and Agor owned the land on which

2. *The Lynlil Defendants (Barile, Stockfield and Boniello) Are Not Liable to Plaintiffs Under CERCLA.*

While there are circumstances in which officers or shareholders of a corporate "owner" of a facility can be held liable as an "operator" under CERCLA, this is not one of them. In this Circuit, liability has attached to individuals as officers or shareholders where they specifically directed, sanctioned or actively participated in the activities that led to the release of hazardous substances. *See, e.g., Shore Realty,* 759 F.2d at 1052. It is undisputed that the Lynlil Defendants did nothing of the sort, since they (like the Lynlil corporate defendant) were not associated with the property until well after the offending activity ceased. Moreover, Stockfield, it appears, was not even an officer, director or stockholder of Lynlil. He functioned solely as corporate counsel, which further insulates him from liability.[21] The CERCLA claims against these three individuals are dismissed.

3. *Lynlil and the Lynlil Defendants Are Not Liable to Plaintiffs Under RCRA.*

(a) *Lynlil and the Lynlil Defendants Did Not Contribute to the Disposal of Hazardous Waste on the Site.*

Plaintiffs' RCRA claims against Lynlil and the Lynlil Defendants must also be dismissed because there is no evidence in this record from which a trier of fact could conclude that they "contributed [to or is] contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the

Lynlil constructed the community water system in use today. However, Agor is not a defendant in this action and Plaintiffs fail to demonstrate how Stockfield's involvement in Agor's corporate structure subjects him to CERCLA liability for Lynlil's alleged acts or failure to act.

environment." 42 U.S.C. § 6972(a)(1)(B). The term "contributed to" is not defined under RCRA, so courts have looked to its ordinary meaning. *See, e.g., Zands*, 779 F.Supp. at 1264. The term has been universally held to infer something more than mere ownership of a site; some level of causation between the contamination and the party to be held liable must be established. *See United States v. Hardage*, 116 F.R.D. 460, 466 (W.D.Okla.1987). As noted above, it is undisputed that the disposal about which Plaintiffs complain ceased some 15 years before Lynlil had anything to do with the property. The fact that Lynlil came into ownership of the property years after the allegedly offending activity means it cannot be held liable under RCRA.

Plaintiffs contend that Lynlil contributed to the disposal of hazardous wastes "by virtue of their studied indifference"[22] to the alleged passive migration of hazardous waste, through the groundwater or otherwise. Lynlil counters that this sort of passive migration does not constitute "disposal" of hazardous waste as defined in RCRA.

I conclude that Lynlil is correct, particularly in light of the Second Circuit's ruling in *ABB Indus.*, 120 F.3d at 357–59, a case decided after the instant motions were fully submitted. In *ABB Indus.*, the Second Circuit rejected a similar "passive migration" argument as a basis for "disposal" liability under CERCLA or RCRA. *Id.* (citing *U.S. v. CDMG Realty*, 96 F.3d 706, 714–15 (3d Cir.1996)).

*ABB Indus.* and *CDMG Realty*, whose analysis the *ABB Indus.* Court explicitly adopted, are cases closely on point with this one. In those cases, as here, the defendants became the owner of property after the dumping of allegedly hazardous

substances occurred. The plaintiff in *CDMG Realty* argued that the defendant should be held liable for the costs of cleanup under CERCLA as an owner at the time of disposal because contaminants that had been placed on the property under yet another prior owner spread further during the defendant's tenure as owner of the property. The Third Circuit rejected this theory "based on the plain meaning of the words used" in CERCLA's definition of disposal,[23] and held that words like "leaking" and "spilling," on which some courts had relied to hold an owner liable for passive migration under CERCLA, "should be read to require affirmative human action." *CDMG Realty*, 96 F.3d at 713–14. The *ABB Indus.* Court agreed, concluding that to read the statute otherwise would render useless CERCLA's "innocent owner" defense because defendants could never demonstrate that they acquired land "after the disposal" of hazardous materials. *ABB Indus.*, 120 F.3d at 358. As the panel observed, "[o]nce hazardous chemicals are in the ground, they usually spread, and therefore, there would almost never be an identifiable period 'after the disposal.'" *Id.* The *ABB Indus.* Court also upheld, based on its CERCLA discussion, dismissal of the plaintiff's RCRA claims "[b]ecause ABB cannot show that [defendants] spilled hazardous chemicals or otherwise contaminated the site . . . ." *Id.* at 359.

Plaintiffs here correctly point out that *CDMG Realty* was a CERCLA case, not a RCRA case, but the outcome in *ABB Indus.*, which was a CERCLA *and* RCRA case, illustrates that the distinction is of no moment. Moreover, as noted above, CERCLA defines "disposal" by reference to RCRA. *Compare* 42 U.S.C. § 9601(29) *with* 42 U.S.C. § 6903(3). There is, there-

---

**22.** Pls.' Br. at 42.

**23.** CERCLA defines "disposal" at 42 U.S.C. § 9601(29) by reference to the Solid Waste Disposal Act (also known as RCRA). RCRA's definition of "disposal," found at 42 U.S.C. § 6903(3), begins with:

the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water . . .

42 U.S.C. § 6903(3).

fore, no reason not to apply the same principle in this case—especially in that a finding precluding liability for the passive migration of substances that are already on a piece of property is consistent with the plain meaning of both the words "disposal" and "contributed to" as they are used in RCRA.

I therefore conclude that Lynlil did not "contribute to" the "disposal" of any substance on the Site, and dismiss Plaintiffs' claims against the company and the individual Lynlil Defendants under RCRA.

### (b) *Septic Waste Does Not Constitute a Hazardous Substance under RCRA.*

■ Even if Lynlil and the Lynlil defendants were found passively to have contributed to the disposal of septic waste at the Site, they would still not be liable under RCRA. RCRA imposes liability only for contributing to the disposal of "hazardous wastes" as that term is defined in the statute. If a substance is not on the "hazardous waste" list, there can be no finding of imminent and substantial danger under RCRA. *See, e.g., Price v. U.S. Navy,* 818 F.Supp. 1323, 1325 (S.D.Cal.1992), *aff'd,* 39 F.3d 1011 (9th Cir.1994). Septic waste is not listed as a hazardous substance under RCRA. In fact, it is specifically *excluded* from the list of hazardous substances. *See* 40 C.F.R. § 261.4(b)(1). Since it is the dumping of septic waste, an excluded substance, that is the gravamen of the complaint in this action, Plaintiffs' complaint fails as a matter of law.

Plaintiffs contend that, under the "mixture rule," septic waste—a solid waste—becomes hazardous waste once it is commingled with a hazardous waste. Plaintiffs speculate that hazardous substances detected at the Site are the chemical remains of degreasers, including septic tank cleaners and other household cleaners, that were either discarded by consumers down their drains or poured down drains and septic pipes to clear blockages. *See* Pls.' Br. at 34–35. Thus, Plaintiffs conclude, the septic waste that was subse-

quently dumped at the DeLuca Farm Site constituted hazardous waste because it combined solid and hazardous wastes. *See Id.*

However, Plaintiffs point to no evidence that anyone involved in this case did, in fact, use such solvents to clean the tanks. Instead, they offer their experts' hypothesis about how such substances *could* have gotten to the Site. They must do more, however, than speculate in order to establish a genuine, disputed fact issue. *See Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 12 (2d Cir.1986).

■ Moreover, Plaintiffs are barred from invoking the mixture rule in light of its retroactive invalidation in 1991. *See Shell Oil Co. v. EPA,* 950 F.2d 741, 752 (D.C.Cir.1991) (vacating the rule for EPA's failure to follow requisite notice and comment procedures); *United States v. Goodner Bros. Aircraft, Inc.,* 966 F.2d 380, 384–85 (8th Cir.1992) (finding *Shell Oil*'s invalidation of mixture rule to apply retroactively). While the EPA subsequently promulgated a new mixture rule in 1992, the new rule cannot be applied retroactively to the alleged disposals at the DeLuca Farm Site. *See Goodner Bros.,* 966 F.2d at 385. Consequently, the mixture rule cannot apply here to render the septic waste, that was disposed at the Site, a hazardous substance.

Plaintiffs cannot establish that the septic waste at the Site presents an imminent and substantial endangerment under RCRA, so their claim must be dismissed.

### 4. *The State Common Law Claims Against Lynlil and the Lynlil Defendants are Dismissed Without Prejudice.*

Just as I concluded with respect to Putnam County, having dismissed Plaintiffs' federal claims against Lynlil and the Lynlil Defendants, I decline to exercise pendent jurisdiction over the remaining state common law claims. *See* 28 U.S.C. § 1367(c). These claims are dismissed without preju-

dice to Plaintiffs' right to file them in State Supreme Court. All the Lynlil Defendants' defenses to these claims are, of course, preserved.

> 5. *The Cross Claims for Indemnity Asserted by Putnam County, Lynlil, and the Lynlil Defendants Against Each Other Are Dismissed.*

As the claims against Putnam County, Lynlil, and the Lynlil Defendants have all been dismissed, their cross claims against each other are dismissed with prejudice as well. To the extent that they seek indemnification, contribution and reimbursement from the DeLuca Defendants, pursuant to state law, these claims may be reasserted in State Supreme Court.

> 6. *The Third–Party Contribution Claims Asserted by Lynlil and the Lynlil Defendants Against Olga DeLuca, Elizabeth DeLuca, Thomasina Christianson are Dismissed.*

As the claims against Lynlil and the Lynlil Defendants have all been dismissed, their third-party contribution claims against Olga DeLuca, Elizabeth DeLuca, and Thomasina Christianson, under CERCLA, are dismissed with prejudice.

> 7. *Lynlil's and Stockfield's Counterclaims*

Lynlil and Stockfield asserted counterclaims against the Plaintiffs for frivolous prosecution of a RCRA claim. Lynlil also asserted a counterclaim against the Plaintiffs for contribution and indemnification of any CERCLA liability found against Lynlil, and a third counterclaim seeking recovery of response costs from Plaintiffs under CERCLA for Lynlil's expenses in investigating the Site and building an alternate public water supply. Lynlil's counterclaim for contribution and indemnification is dismissed as moot. As to the remaining counterclaims, since no party has moved for summary judgment on them, and since they are not mooted by the Court's dis-

missal of the Plaintiffs' federal claims, they remain.

## C. Town of Carmel

> 1. *Town of Carmel's Motion to Dismiss Plaintiffs' CERCLA Claim is Granted.*

> (a) *Town of Carmel Lacked Sufficient Site Control to be Liable as a CERCLA Site "Owner."*

Plaintiffs allege that, as a result of multiple agreements between Carmel and the DeLucas to permit the disposal of septic waste at the DeLuca Farm Site, Carmel "owned" the Site from 1955 to 1970 for purposes of CERCLA liability. *See* Cplt., ¶¶ 12, 62; *see also* 42 U.S.C. §§ 9601(20)(A) (defining "owner or operator") & 9607(a)(2) (extending liability to former owners or operators).

CERCLA provides little guidance to the courts in assigning liability to owner/operators, defining this term in tautological fashion as ". . . any person owning or operating such facility." 42 U.S.C. § 9601(20)(A). The Ninth Circuit has characterized this unhelpful statutory definition as "a bit like defining 'green' as 'green.'" *Long Beach Unified School Dist. v. Dorothy B. Godwin Calif. Living Trust,* 32 F.3d 1364, 1368 (9th Cir.1994). The *Long Beach* Court and others have interpreted the statutory definition's circularity as an instruction to employ the words' ordinary meanings rather than an unusual or technical definition. *See, e.g., Edward Hines Lumber Co. v. Vulcan Materials Co.,* 861 F.2d 155, 156 (7th Cir. 1988); *Grand Trunk West. R. Co. v. Acme Belt Recoating, Inc.,* 859 F.Supp. 1125, 1130–31 (W.D.Mich.1994) (quoting Black's Law Dictionary definition of "owner" and requiring dominion or proprietary interest in property).

This Court has previously recognized that the owner of a leasehold interest in a CERCLA facility may be liable as an owner of that facility, as long as the lessee exercised sufficient "site control" to

"place[ ] it in the shoes of 'owners.' " *United States v. A & N Cleaners & Launderers,* 788 F.Supp. 1317, 1333 (S.D.N.Y.1992). Carmel disputes Plaintiffs' contention that its agreements with the DeLucas gave it a leasehold interest in the property; however, this Court accepts Plaintiffs' allegation for the purpose of this summary judgment motion.[24] Notwithstanding this assumption, Plaintiffs have not presented sufficient allegations of "site control" to render the leaseholder Carmel a CERCLA "owner."

A look at the facts of *A & N Cleaners* is helpful in resolving this issue. In that case, the leaseholder exercised a level of responsibility and a degree of site control far beyond any attributes of ownership Carmel had over the DeLuca Farm Site. In that case, the lessee had (i) the right to sublet all or part of the property without the obligation to notify the fee owner; (ii) the discretion to determine the use of the property by its subtenants; (iii) the obligation (which it exercised) to keep the entire premises in good condition and repair at all times; (iv) the obligation to comply with all governmental rules and regulations concerning nuisances; and (v) the authority (which it exercised) to investigate and repair the interiors of the sublet premises. *See A & N Cleaners,* 788 F.Supp. at 1333–34. As the *A & N Cleaners* Court observed, "[w]ith the exception of the power of alienation, therefore, [the leaseholder] enjoyed the rights and bore the obligations of an 'owner' as the term is commonly understood." *Id.* at 1334.

The same cannot be said of the Town of Carmel's responsibilities or privileges with respect to the DeLuca Farm Site. Carmel allegedly paid the DeLucas from 1955 to 1970 to set aside land for septic waste disposal and then issued permits to septic tank haulers. The tank haulers paid the DeLucas for each truck load of septic waste deposited at the Site. According to the testimony of defendant Mantovi, Carmel at one time plowed or otherwise maintained the access road to the DeLuca Farm. *See* Supplemental Memorandum of Law on Behalf of Plaintiffs in Opposition to Defendant Town of Carmel's Motion for Summary Judgment, at 2–8 (citing documentary evidence). But, in contrast to the *A & N Cleaners* leaseholder's active site control, Carmel had no involvement with the Site's day-to-day management.

Plaintiffs offer the site specifications contained in the 1960 agreement between the Town of Carmel and Philip and Mary DeLuca (the "1960 Agreement") to support their allegation that the Town exercised sufficient site control to be liable as an owner, but that argument is unavailing. *See* exh. 12 to Sachs aff.[25] The 1960 Agreement demonstrates that the DeLucas agreed to provide septic disposal trenches within specified dimensions, to cover the deposited waste with clean earth, and to close the trenches properly when they became filled to capacity. *See Id.* These provisions do not establish that Carmel involved itself in the day-to-day management of the Site, as necessary to treat a leaseholder as a CERCLA owner. Rather, they show that the Town exercised its regulatory functions by permitting a septic waste dump to be constructed, but demanding that certain precautions be taken to protect the local environment. As mentioned previously in the discussion of Putnam County's motion, CERCLA excludes from liability a municipality that exercised its regulatory functions, but did not directly manage the disposal activities. *See* § III(A)(1)(c)(i), *supra; see also United States v. Township of Brighton,* 153 F.3d 307, 316 (6th Cir.1998) (noting that "mere regulation does not suffice to render a

---

**24.** *But see Acme Printing Ink Co. v. Menard, Inc.,* 870 F.Supp. 1465, 1484 (E.D.Wis.1994) (requiring present possessory interest in CERCLA property for defendant to be a leasehold owner).

**25.** A more legible copy of the same document is attached as exh. C to Addendum to Supplemental Memorandum of Law in Support of Defendant Town of Carmel's Motion for Summary Judgment.

government entity liable, but actual operation (or 'macromanagement') does"); *cf. United States v. Rohm & Haas Co.,* 939 F.Supp. 1157, 1160 (D.N.J.1996) (holding state agency not liable as CERCLA owner/operator though it approved use of landfill site, periodically inspected the site, and ultimately shut the site down).

    (b) *Town of Carmel is Not Liable as a CERCLA "Operator" under the "Actual Control" Test.*

■ Plaintiffs contend that Carmel is also liable under CERCLA as an "operator" of the DeLuca Farm Site, but they have failed to allege facts sufficient to show that Carmel played such a role in the operation of the Site.

The Supreme Court, in *United States v. Bestfoods,* recently provided some guidance to courts in applying CERCLA's statutory definitions to determine "operator" liability. *Bestfoods,* 524 U.S. 51, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998). The Court defined "operator" according to its ordinary meaning:

> [U]nder CERCLA, an operator is simply one who directs the workings of, manages, or conducts the affairs of a facility. To sharpen the definition for purposes of CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.

*Id.* at 1887.

The Sixth Circuit has applied the *Bestfoods* holding to a government entity in *United States v. Township of Brighton, supra,* 153 F.3d at 314 (*Bestfoods* itself had considered apportioning CERCLA liability only among related corporate entities). The *Brighton* Court held that CERCLA "operator" liability requires affirmative acts and "actual control" over disposal activities at the facility. *See Id.* Faced with a municipality that, like Carmel, had: (1)

entered a waste disposal agreement for the benefit of township residents; (2) required the dump to meet certain specifications; and (3) paid rent and maintenance fees to the dump owner, the *Brighton* Court found these facts insufficient to impose CERCLA operator liability. Moreover, the *Brighton* panel could not find "operator" liability even in light of evidence that, *unlike* Carmel "[t]he township [of Brighton] was *not* operating at arm's length with a contractor." *Id.* at 315

The *Brighton* Court elaborated on the township's activities with respect to the dump: (i) it specified in its agreement that the dump would "be under the supervision of the Board of Appeals;" (ii) it made "repeated and substantial *ad hoc* appropriations" in excess of any rental or permit fees; (iii) it "made arrangements (including with the local Junior Fire Department) for bulldozing and other maintenance;" and (iv) it "took responsibility for ameliorating the unacceptable condition of the dump, before and after scrutiny from state government," among others. *Id.* at 315–16. On appeal, the Sixth Circuit could not determine whether all of these activities, in the aggregate, rendered the township an actual operator of the dump, instead of a mere regulator, so it remanded for a determination by the District Court.

While the Second Circuit has not yet adopted a test for "operator" liability under CERCLA, all of the other Courts of Appeal that have addressed the issue with respect to government entities have, like the Sixth, required a showing of actual and substantial control. *See, e.g., United States v. Vertac Chem. Corp.,* 46 F.3d 803, 809 (8th Cir.1995) (holding that regulations and inspections did not constitute substantial control over the production of Agent Orange for purposes of CERCLA liability); *FMC Corp. v. United States Dept. of Commerce,* 29 F.3d 833, 843 (3d Cir.1994) (finding that the United States government had exercised "substantial control" over the production of high tenacity rayon

where the government determined what product the facility would produce, the level of production, the price of the product, and to whom the product would be sold); *Dart Indus., Inc.*, 847 F.2d at 146 (declining to classify local government as operator merely for its failure to enforce state regulations adequately). As the *Brighton* Court emphasized, the plain meaning view of "operator" espoused in *Bestfoods* requires that putative operators must have "performed some acts—that they 'operated' the site by 'direct[ing] the workings,' 'manag[ing],' or 'conduct[ing] the affairs'— before they can be held responsible." *Brighton*, 153 F.3d at 314 (quoting *Bestfoods* ) (modification in original).

Plaintiffs offer no facts to show that Carmel exercised any ongoing control over the disposal activities at the Site. As discussed above, the site specifications contained in the 1960 Agreement do not establish that Carmel directed the workings at the Site or influenced its "macromanagement." Plaintiffs offer no evidence in the voluminous record to suggest that Carmel carried out disposal activities at the Site, provided personnel, equipment, or supplies, had, or exerted, any control over the activities or management at the Site. Moreover, the 1960 Agreement is specifically limited to septic waste; it confers no authority whatsoever upon Carmel or any other party concerning the disposal of hazardous substances. Thus, it cannot be said that Carmel had the authority to manage the disposition of any alleged hazardous substances at the Site.

   (c) *Town of Carmel Did Not "Arrange" for the Disposal or Treatment of Hazardous Substances at the Site for Purposes of CERCLA Liability.*

     ■ In addition to "owner and operator" liability, CERCLA also imposes liabil-

ity upon "any person who by contract, agreement, or otherwise *arranged* for disposal or treatment, or *arranged* with a transporter for transport for disposal or treatment, of hazardous substances...." 42 U.S.C. § 9607(a)(3) (emphasis added). The Second Circuit has held that, in order for "arranger" liability to attach to parties not actively involved in the timing, manner, or location of disposal, there must be a sufficient nexus between the potentially responsible party and the disposal of the hazardous substances. *See General Electric Co. v. AAMCO Transmissions, Inc.*, 962 F.2d 281, 286 (2d Cir.1992); *accord BF Goodrich Co. v. Murtha*, 958 F.2d 1192, 1199 (2d Cir.1992) (finding that municipality's management of disposal activities provided sufficient nexus for "arranger" liability).[26] The *General Electric* Court elaborated that "arranger" liability flows from "the *obligation* to exercise control over hazardous waste disposal, and not the mere ability or opportunity to control the disposal of hazardous substances...." *General Electric*, 962 F.2d at 286 (emphasis added).

Plaintiffs do not allege facts sufficient to prevail under this standard on an "arranger" liability claim. As previously discussed, Plaintiffs have neither established that Carmel was actively involved in the timing, manner, or location of disposal, nor shown that the Town had an obligation to control the septic waste haulers to whom it issued permits to use the DeLuca Farm Site. Absent such an obligation, "arranger" liability cannot be imposed. *See Id.* Moreover, evidence that the Town assisted private waste haulers to secure the right to deposit *septic* waste at the DeLuca Farm Site, for a fee, does not demonstrate that Carmel intentionally involved itself in the

---

**26.** The *Murtha* Court expressly noted that a sufficient nexus does *not* exist where the municipality "is responsible only for promulgating disposal regulations or for permitting disposal facilities." *B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1199 (2d Cir.1992). In *Murtha*, twenty-three municipal defen-

dants did not merely issue permits authorizing disposal, but maintained contracts with defendant site owners/operators conceded for the ongoing collection and disposal of municipal solid waste. *See B.F. Goodrich Co. v. Murtha*, 754 F.Supp. 960, 968–72 (D.Conn. 1991).

disposal of *hazardous* substances allegedly contained in that septic waste. *See, e.g., United States v. Cello–Foil Prods., Inc.,* 100 F.3d 1227, 1231–32 (6th Cir.1996) (putative CERCLA "arranger" must have actual intent to dispose of dangerous chemicals to be liable); *Amcast Indus. Corp. v. Detrex Corp.,* 2 F.3d 746, 751 (7th Cir. 1993) ("arranger" liability requires intentional action and precludes accidental spillage); *cf. Hassayampa Steering Committee v. Arizona,* 768 F.Supp. 697, 701 (D.Ariz.1991) (holding state not liable as "arranger" when it selected landfill and authorized haulers to deposit waste there).

### 2. *Town of Carmel's Motion to Dismiss Plaintiffs' RCRA Claim is Granted.*

■ Plaintiffs' RCRA claim against Carmel must be dismissed, as a matter of law, because the Town was neither owner nor operator, as these terms are construed, and because Plaintiffs have not identified any evidence that the septic waste deposited at the Site through Carmel's involvement contained hazardous materials.

As discussed above, in order to establish liability under RCRA, Plaintiffs must demonstrate that the Town of Carmel was an owner or operator of the Site, or contributed to handling, storage, treatment, transportation, or disposal of solid or hazardous waste at the site that may present an imminent and substantial endangerment to health or the environment. *See* 42 U.S.C. § 6972(a)(1)(B). This Court has already concluded that Carmel was neither an owner nor an operator for purposes of CERCLA liability, and Plaintiffs identify no legal authority indicating that the result should be different under RCRA. Just as the Court found with respect to Putnam, there is no evidence that Carmel created solid waste, disposed of it, transported it, or otherwise handled it. The Town did not

"contribute" as construed under RCRA and, thus, is not liable. *See, e.g., Zands,* 779 F.Supp. at 1264.

Moreover, having previously concluded that septic waste does not constitute a hazardous substance under RCRA (*see* § III(B)(3)(b), *supra* ), this Court finds that Plaintiffs cannot establish that Carmel contributed to the disposal of materials or substances at the Site which present an imminent and substantial endangerment under RCRA. Plaintiffs' RCRA claim must be dismissed as against the Town of Carmel.

### 3. *The State Common Law Claims Against Town of Carmel are Dismissed Without Prejudice.*

Having dismissed Plaintiffs' federal claims against Carmel, I decline to exercise pendent jurisdiction over the remaining state common law claims. *See* 28 U.S.C. § 1367(c). These claims are dismissed without prejudice to Plaintiffs' right to refile them in State Supreme Court, and remain subject to all defenses.

### 4. *Town of Carmel's Cross Claims are Dismissed as Moot.*

As the claims against Carmel have been dismissed, its cross claims on all of Plaintiffs' causes of action are dismissed as moot.

## D. Joseph Mantovi and MSSI

### 1. *Mantovi's and MSSI's Motion to Dismiss Plaintiffs' CERCLA Claim is Granted.*

■ Plaintiffs allege that Mantovi and MSSI are potentially responsible parties solely under CERCLA's "transporter liability" category because they carted septic waste allegedly containing hazardous substances to the Site between 1955 and the mid–1970s.[27] Based on the record before

---

**27.** Transporter liability applies to "any person who … accepted any hazardous substances for transport to disposal … facilities … se-

lected by such person, from which there is a release, or a threatened release which causes

this Court, Plaintiffs cannot, as a matter of law, prevail on this claim because they do not identify evidence sufficient to make out a *prima facie* case of transporter liability against Mantovi and MSSI. As the Second Circuit recently held, in *Prisco v. A & D Carting Corp., supra,* "[t]o impose [transporter] liability on a defendant, a CERCLA plaintiff must prove more than that a defendant transported material to the site; he or she *must show that the material contained a hazardous substance." Id.,* 168 F.3d at 605 (emphasis added). Although the dismissal upheld in *Prisco* came after a full trial on the plaintiff's CERCLA and RCRA claims, the ruling applies here in that it clarifies the elements of a *prima facie* case for transporter liability. If Plaintiffs have not offered evidence sufficient to raise a disputed issue of fact needed to make out a *prima facie* case under *Prisco,* then their claim cannot survive summary judgment.

Plaintiffs point to expert testimony that some septic waste from the era in question contained solvents and degreasors used to clean household plumbing, septic tanks, and septic pumps, and that these materials could account for the presence of TCE, a hazardous substance, at the Site today. *See* Pls.' Br. at 31–34. But these allegations, absent any evidence that the septic waste hauled by Mantovi or MSSI *actually contained a hazardous substance,* is legally insufficient to impose transporter liability on these defendants. Mantovi conceded at deposition that he and his company disposed of septic waste at the DeLuca Farm during the relevant time period, under an agreement with the DeLucas and a permit from the Town of Carmel, but his admission does not render him or his company liable without some evidence that the septic waste material also contained hazardous substances. Mantovi testified—and Plaintiffs do not refute—that his company never used chemicals to clean septic tanks or his equipment. *See* Dep. of Jo-

seph Mantovi, attached to MSSI's and Mantovi's Memorandum of Law Supporting Motion for Summary Judgment, at 28–29. Plaintiffs allege that Mantovi's customers *may* have deposited degreasors containing hazardous substances down their own drains, which Mantovi and MSSI then pumped out and disposed of at the Site,[28] but unsupported speculations do not raise a genuine issue of material fact sufficient to resist summary judgment. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (noting that, on summary judgment, non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts."); *City of New York v. Chemical Waste Disposal Corp.,* 836 F.Supp. 968, 976 (E.D.N.Y.1993) (applying same in CERCLA context).

Plaintiffs' CERCLA claim against Mantovi and MSSI is dismissed.

2. *Mantovi's and MSSI's Motion to Dismiss Plaintiffs' RCRA Claim is Granted.*

Plaintiffs' RCRA claim against Mantovi and MSSI must also be dismissed because Plaintiffs have not offered evidence sufficient to establish liability under this statute either. The only conceivable RCRA ground for Mantovi's and MSSI's liability is as a "transporter" of solid or hazardous waste, under 42 U.S.C. § 6972(a)(1)(B). Under the *Prisco* Court's reading of this section, Plaintiffs cannot prevail as a matter of law unless they "establish a link between the waste attributable to an individual defendant and the risk of imminent and substantial endangerment." *Prisco,* 168 F.3d at 608–09. Plaintiffs do not dispute that Mantovi's and MSSI's sole link to the Site is through the disposal of septic waste, and this Court has already concluded that septic waste, in and of itself, does not constitute a hazardous substance un-

---

the incurrence of response costs, of a hazardous substance ..." 42 U.S.C. § 9607(a)(4).

**28.** Pls.' Br. at 77–78.

der RCRA (*see* § III(B)(3)(b), *supra*). That conclusion is unchanged by Plaintiffs' rank speculation that the septic waste deposited by Mantovi and MSSI *may have contained* hazardous materials introduced by Carmel residents into their own septic systems. Accordingly, Plaintiffs cannot link Mantovi and MSSI to any substances that pose an imminent and substantial endangerment to health or the environment.

Plaintiffs' RCRA claim is dismissed as against Mantovi and MSSI.

### 3. *The State Common Law Claims Against Mantovi and MSSI are Dismissed Without Prejudice.*

Having dismissed Plaintiffs' federal claims against Mantovi and MSSI, I decline to exercise pendent jurisdiction over the remaining state common law claims. *See* 28 U.S.C. § 1367(c). These claims are dismissed without prejudice to Plaintiffs' right to refile them in State Supreme Court.

### 4. *Mantovi's and MSSI's Cross Claims are Dismissed as Moot.*

As the claims against Mantovi and MSSI have been dismissed, their cross claims on all of Plaintiffs' causes of action are dismissed as well.

### 5. *Mantovi's and MSSI's Counterclaims*

Mantovi and MSSI asserted counterclaims against the Plaintiffs for frivolous prosecution of a RCRA claim and for contribution and indemnification of any CERCLA liability found against Mantovi or MSSI. Mantovi's and MSSI's counterclaim for contribution and indemnification is dismissed as moot. As no party has moved for summary judgment on the frivolous prosecution counterclaims, they remain in the case, since they are not mooted by dismissal of Plaintiffs' federal claims.

### E. Olga DeLuca, Elizabeth DeLuca, and Thomasina Christianson

As the third-party contribution claims asserted by Lynlil and the Lynlil Defendants, under CERCLA, against Olga DeLuca, Elizabeth DeLuca, and Thomasina Christianson have all been dismissed with prejudice, the Third–Party Defendants' motion for summary judgment dismissing these claims is now moot.

The Third–Party Defendants' own cross claims for contribution and indemnity against Carmel, Putnam, Lynlil, the Lynlil Defendants, Mantovi, MSSI, and the DeLuca Defendants are also dismissed with prejudice to the extent they seek relief under CERCLA. To the extent they seek common law indemnity and/or contribution, these claims are dismissed without prejudice to their reassertion in State Supreme Court. All of the various defendants' defenses to these claims are, of course preserved.

### F. Anthony DeLuca and Theresa Miller

■ This leaves us with the unfortunate Anthony DeLuca and Theresa Miller. In a simpler and less knowledgeable era, their father and mother made a little money on the side by letting their neighbors dump their septic waste on an unused parcel of the family farm. The two named defendants both came into ownership of a 13.6% undivided interest in the farm in three separate transfers between 1964 and 1966. Defendants DeLuca and Miller ultimately sold their interest in the property to Lynlil in 1985, well after the cessation of dumping, which was alleged to be in the mid–1970s. Thus, they would seem to fall squarely within the definition of CERCLA "covered person" as "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of. . . ." 42 U.S.C. § 9607(a)(2); *see also A & N Cleaners,* 788 F.Supp. at 1332.

DeLuca and Miller contend that they did not participate in the control, management,

or operation of any aspect of the Site, and that they had no involvement whatsoever in any disposal activities on the DeLuca Farm. While it is not at all clear that this claim, if true, would insulate them from liability under CERCLA's strict liability standard, Plaintiffs have identified sufficient documentary evidence to create a triable issue of fact concerning the DeLuca Defendants' involvement in the Site's management. *See* Pls.' Br. at 67–69.

Moreover, the DeLuca Defendants' reliance upon CERCLA's third-party defense is misplaced because, unlike Lynlil, the DeLuca Defendants acquired their interests in the farm while septic waste disposal was still ongoing. As discussed above, the third-party defense is available only to innocent purchasers who acquired the contaminated property *after* the release of hazardous substances. *See* 42 U.S.C. § 9607(b)(3); *see also Lashins Arcade,* 91 F.3d at 360. Although Plaintiffs have not identified the date or source of the alleged contamination, it is at least a disputed issue of fact whether the release occurred after 1964, that is, after the DeLuca Defendants came into ownership of their interests in the DeLuca Farm.

The DeLuca Defendants' motion for summary judgment is denied.

## V. *Further Proceedings*

What remains of this action after the various grants of summary judgment, the dismissal of claims, cross claims, counterclaims, and third-party claims as moot, and the Court's declination of pendent jurisdiction over the common law claims, cross claims, and third-party claims, is very little:

1. Plaintiffs' claims against Anthony DeLuca and Theresa Miller under CERCLA;

2. Counterclaims against Plaintiffs by Putnam County, Lynlil, Stockfield, MSSI, and Mantovi for frivolous prosecution of RCRA claims against them;

3. A counterclaim against Plaintiffs by Putnam County for frivolous prosecution of CERCLA claims; and

4. Counterclaims against Plaintiffs by Lynlil for recovery of response costs under CERCLA.

The Court is unable to provide certification for an interlocutory appeal pursuant to 28 U.S.C. § 1292(b) because I cannot opine that there are substantial grounds for difference of opinion on any controlling question of law. It seems to me that the controlling questions under CERCLA and RCRA have been fairly well settled in recent years. Nonetheless, I am of the view that the ultimate termination of this litigation would be materially advanced by a prompt appeal, and, but for the pendency of the claims for frivolous prosecution and for CERCLA response costs by Lynlil, Putnam, Stockfield, Mantovi, and MSSI, I would have severed the claims against those defendants, as well as Carmel and the remaining Lynlil defendants, dismissed them per this opinion, and directed the immediate entry of judgment. As long as the frivolous prosecution and CERCLA response cost claims (as to which no summary judgment motions have been filed) remain in the case, I am unable to do that. And I am unwilling to sever Carmel, Boniello, and Barile so that they can appeal separately, as that would not advance the ball in any material respect.

Lynlil, Putnam, Mantovi, and MSSI should think long and hard about whether they want to continue to prosecute these counterclaims. I appreciate that Mr. Stockfield is in a somewhat different position than the other defendants asserting counterclaims, but he, too, needs to consider his position. All of the counterclaimants should consider whether their frivolous prosecution claims are any less frivolous than the RCRA and CERCLA prosecutions they challenge.

All parties who have claims remaining before this Court are directed to appear at a conference on Monday, June 28 at 4 p.m.

This constitutes the decision and order of the Court.